KDT INDUSTRIES, INC., Plaintiff,

v.

The HOME INSURANCE
COMPANY, Defendant.

Civ. A. No. 81–2105–N.

United States District Court,
D. Massachusetts.

Feb. 14, 1985.

Daniel C. Sacco, Ronald B. Schwartz,
Goulston & Storrs, Boston, Mass., for
plaintiff.

J. Owen Todd, Hale & Dorr, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

This is an action commenced by plaintiff KDT Industries, Inc. (KDT), to recover sums allegedly due under a Directors and Officers Liability Policy (D & O policy) issued by defendant The Home Insurance Company (Home). Plaintiff alleges that coverage is afforded by Home's policy for claims asserted against plaintiff's directors and officers in two lawsuits brought by KDT stockholders. Defendant refused to honor the claims on the ground that the D & O policy expressly excluded from coverage the two suits brought against the KDT directors and officers. Accordingly, defendant Home has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Plaintiff KDT has opposed the motion and moved for summary judgment. Inasmuch as Home's motion to dismiss relies on matters not contained in the pleadings, it is not properly a motion pursuant to Rule 12(b)(6) and must be treated as a cross-motion for summary judgment. Fed. R.Civ.P. 12(c).

I agree with the parties that this matter is appropriate for summary judgment, as the submissions disclose no disputed issue of fact which is both genuine and material. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The primary issue before this Court is the legal interpretation of the insurance contract between the parties. For the following reasons, I find that summary judgment must enter for the plaintiff, KDT.

**1.** KDT, a Delaware corporation, is permitted by Del.Gen.Corp.L. § 145 to indemnify its directors and officers for any expenses, including attorney's fees, incurred in defense of an action. The corporation may pay those expenses before the termination of the action and may purchase insurance from which it, in turn, is reimbursed.

## I. *Facts*

The undisputed facts reveal that from January 1, 1975, through December 31, 1981, KDT (through its predecessor King's Department Stores, Inc., which was renamed KDT on June 4, 1981, and which will be referred to as KDT throughout this memorandum) bought five D & O policies from Home.[1] The 1978, 1979, 1980, and 1981 policies each had limits of five million dollars and excluded certain specified items from coverage.

Home bases its denial of coverage on an endorsement which states:

"In consideration of the premium charged, it is agreed that the Insurers shall not be liable to make payment for loss in connection Officers/Insureds directly or indirectly arising from any attempt to gain control or from any gaining of control of the Company or any claim made by any minority stockholder of the Company.

It is further agreed that in the event that control of the Company is acquired by any corporation, person or group of persons by merger, consolidation, acquisition of stock or assets or otherwise, this policy shall exclude any claim made by or in the right of any such corporation, person or group of persons.

The word 'control' as used herein should be defined as in the regulations issues by the S.E.C. under the S.E.C. Act of 1933."[2]

The endorsement was added to the 1978 policy under the following circumstances. When the 1977 policy came up for renewal, KDT's insurance broker, Paul MacEachern, obtained two 10-day extensions. For some reason, KDT failed to renew the policy within the extended policy period and coverage lapsed. During the lapse in coverage, in January, 1978, W.R. Grace & Com-

**2.** 17 C.F.R. § 230.405(f) defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

pany (Grace) announced that it was considering acquiring control of KDT. After KDT completed its application for the policy's renewal, Home's underwriter, Peter Wood, informed MacEachern that he would not renew the policy unless it excluded coverage for any claims attributable to the so-called "Grace situation." MacEachern told F. Walter Erich, the KDT officer in charge of insurance, that "[KDT] essentially had no choice but to accept Home's terms and conditions" because "it would have been impossible to obtain alternative coverage on such short notice. (MacEachern Affidavit, ¶ 3). Erich agreed, on behalf of KDT, to accept the endorsement to the 1978 policy. Indeed, the identical endorsement appears in the 1979 and 1980 policies as well. Moreover, the premiums due in these policy periods were higher than the premiums that KDT had paid in the years from 1975 through 1977. (Erich Affidavit, ¶¶ 2, 6).

It seems reasonable to assume, therefore, that Home's primary concern during the period 1978 through 1980 was with the increased risk of takeover attempts and the attendant expensive litigation. Defendant's own submissions support this assumption:

> "On or about January 24, 1978, I learned from an article on that date in the *Wall Street Journal* that W.R. Grace & Co. was considering acquiring a controlling position in [KDT].... " "In my experience as an underwriter for directors and officers liability insurance, a situation involving a possible 'takeover' of one company by another company often leads to claims being made against directors and officers, including claims by minority shareholders. It was also my experience that if a company was a takeover target for one company, it might also be a target for other companies and that when a company is taken over, its entire charac-

ter might change, leading to additional exposure to litigation by minority stockholders, the probability of which I, as an underwriter, could not anticipate in quoting premium terms. Consequently, I decided that I would not write a new policy without excluding litigation arising from claims of the type that might arise from an attempt to control [KDT] or litigation arising from claims by minority shareholders.... "

(Wood Affidavit, ¶¶ 9, 11).

> When I wrote the 1979 policy, I included, as Endorsement 7 to the 1979 policy, language identical to that which had been included by Peter D. Wood as Endorsement 8 to the 1978 policy .... because I was not satisfied that there would be no further efforts to acquire [KDT]. During the negotiations for the 1980 policy, it came to my attention that Cornwall Equities Ltd. was attempting to gain control of [KDT]. Consequently, I again included the language of Endorsement No. 7 to the 1979 Policy as Endorsement No. 6 to the 1980 Policy.... "

(Bowers Affidavit, ¶ 6).[3]

## II. *The Underlying Litigation*

In December, 1979, the three founders of KDT announced their intention to sell their stock to Cornwall Equities Ltd. (Cornwall), a company that was also in the discount department store field. Cornwall was wholly-owned by Sol Kittay. After the sale, Kittay became chairman of KDT.

Shortly after the contemplated stock sale was announced, Esther Okun, a KDT minority stockholder, commenced a derivative action in Delaware Chancery Court, *Okun v. Cornwall Equities, Ltd.*, (C.A. No. 6052) (*Okun I*). Mrs. Okun filed the suit on behalf of the corporation, naming the three founders, Cornwall, and KDT as defendants.[4] The complaint alleged that the

---

**3.** *See also,* Reply Memorandum of the Defendant The Home Insurance Company, at 9:

> The "Grace situation" was, of course, a matter in the distant past by the time the claims which are the subject of this action were made under the 1979 or 1980 policy....

Nonetheless, the endorsement was attached to both, the 1979 and 1980 policies because of Homes continuing concern with the take-over attempts....

**4.** Although stockholder derivative actions are brought on behalf of the corporation, the corpo-

founders, who also happened to be directors of KDT, received a "control premium" when they sold their stock to Cornwall for an inflated price, together with additional consideration in the form of consulting contracts. Such a transaction, the complaint further alleged, amounted to an unfair sale of control, and thereby, a breach of the directors' fiduciary duties. When KDT made a claim under the Home policy for its defense of the *Okun I* litigation, Home denied the claim on the grounds that it was expressly excluded by endorsement.

In the spring of 1980, the new KDT board decided to explore the feasibility of acquiring substantially all of the assets of Cornwall. Since Sol Kittay was the sole stockholder of Cornwall, a committee of three independent directors, one of whom had been the author of the acquisition proposal, was appointed to study the transaction. The three had all been directors of KDT for years before the Cornwall takeover and neither had any connection with Cornwall. That committee unanimously recommended that KDT proceed with the transaction. Subsequently, both the board (Kittay did not vote) and the KDT stockholders approved it.

Despite corporate approval of the transaction, in August, 1980, Sidney Wayne, another KDT minority stockholder, commenced a derivative action in Delaware Chancery Court, *Wayne v. Cornwall Equities, Ltd.* (C.A. No. 6258) (*Wayne*). Later, in October, 1980, Esther Okun renewed her battle with Cornwall and filed another derivative action in the chancery court, in which she made allegations substantially identical to those made in the *Wayne* suit, *Okun v. Cornwall Equities, Ltd.* (C.A. No. 6285) (*Okun II*).[5] Those allegations were that the directors and officers of KDT had breached their fiduciary duties in permitting Cornwall to exercise its control and thereby cause KDT to agree to purchase

substantially all of Cornwall's assets. In addition, the Complaints alleged that the agreement was not entered into in good faith or achieved as a result of arms-length bargaining between KDT and Cornwall; was a self-dealing transaction between the corporation and its controlling shareholder, Cornwall; was at a grossly excessive purchase price; was a waste of KDT's assets; and served no legitimate corporate purpose. In short, Mr. Wayne and Ms. Okun claimed that KDT either should not have acquired the Cornwall assets or should have paid less for them. The Delaware Chancellor concluded that the underlying lawsuits were self-dealing cases:

As I see it, the plaintiffs' case is based chiefly on a charge of self-dealing. Their charge of self-dealing is premised on their accusation that Cornwall, and thus the defendant, Kittay, are in control of [KDT's] board of directors. This latter conclusion is based primarily on three factors, as best I can tell.

First, Cornwall acquired its stock interest in King's by purchasing the stock of three former officers and directors of [KDT] who were themselves running and controlling the corporation at the time. Second, that Kittay himself as the sole owner of Cornwall, is also the chairman of the board and, I gather, chief executive officer of [KDT] at the present time. Third, that immediately upon Cornwall's acquisition of its stock interest in [KDT] the three former officers and directors resigned, and [KDT's] board was enlarged from 10 to 12, and seven of the 12 resulting directors, including Kittay, were named or recommended to the board by Cornwall.

Other factors occurring subsequently during the formulation of the contract in issue are said by the plaintiffs to substantiate and reinforce their conclusion that Kittay through Cornwall is in domination and control of King's board, and

---

ration is usually a nominal defendant. *See infra*, Part IV.

**5.** The allegations as well as the defendants in the two actions were substantially identical. Named defendants included Cornwall, Kittay,

and all but one of KDT's directors. Of course the corporation itself was a nominal defendant, but the three founders of KDT were not named at all.

that as a consequence, Cornwall, being the seller of the assets which [KDT] has agreed to buy, stands on both sides of the transaction.

The plaintiff's theory of the case relies on this basic premise, as I see it, to remove the transaction from the realm of the business judgment of the [KDT] board of directors, and to place it in a posture where the legal burden is upon Cornwall to come forward and establish the fairness of the transaction to [KDT].

Plaintiffs then take the position that Cornwall cannot do this, and their proof is that when in 1978 the defendant, Kittay, through the tender offer merger process obtained all the outstanding shares of Cornwall, he did so on the basis of Cornwall having a shareholder equity of some $18,000,000. Under the proposed transaction here, [KDT] is to acquire all of Cornwall's operating assets comprised mainly of 108 Franklin Specialty Stores and 63 Barkers Discount Department Stores for some $30,000,000. In addition, [KDT] is said to be assuming a $15,000,000 Cornwall obligation which was incurred so as to enable Cornwall to purchase its stock interest in [KDT] while Cornwall is at the same time retaining its stock ownership in [KDT].

From this the plaintiffs urge that they have made a sufficient preliminary showing that the price being paid by [KDT] is excessive since Kittay through Cornwall is receiving almost double what it cost him to acquire Cornwall only two years ago in addition to which [KDT] is picking up Cornwall's tab for acquiring its stock interest in [KDT].

The trouble I have with this at this point is that the strength of the plaintiff's showing, as I see it, as to the comparative values of Cornwall's assets is dependent upon their showing that Cornwall is in control [KDT], or is dominating its board. Otherwise, it seems to me their argument is one lodged against the business judgment of the [KDT]

board as to what the value of Cornwall assets are to [KDT] under present business conditions. In such event, the normal presumption of good faith to which a board of directors is entitled would seem to militate against the entry of a preliminary injunction, at least at this point.[6]
*Wayne v. Cornwall Equities Ltd.,* No. 6258, slip op. at 3–6, (Del.Ch. Oct. 5, 1980).

The *Wayne* and *Okun II* lawsuits prompted KDT to file another claim for reimbursement under its policy with Home. In response, Home took the position that these lawsuits did not differ from *Okun I* and denied coverage for the same reasons that it had for losses incurred in the earlier lawsuit.

The resolution of this action, therefore, depends both upon a characterization of the underlying litigation and upon an interpretation of the insurance endorsement.

### III. *Summary of Arguments*

Plaintiff KDT argues that the underlying litigation arises out of a sale of assets and not out of any attempt to gain control of the corporation. Thus, *Wayne* and *Okun II* were typical self-dealing cases, in which the challenge was to a transaction that was, allegedly, beneficial to the controlling stockholders, but detrimental to the corporation: "The gravamen of the 1980 lawsuits is the fairness of the transactions; the *gaining* of control is simply not an element of the plaintiffs' claim." (KDT's Memorandum in Opposition to Defendant's Motion to Dismiss and in Support of KDT's Motion for Summary Judgment, at 11) (hereinafter, KDT's Memo). Plaintiff further argues that the two cases challenged the "acquisition of assets,.... and did not have any effect whatsoever on the control of [KDT]," to support its position that the underlying lawsuits were simply self-dealing cases, and therefore, would not be barred by the "control" portion of the endorsement. (Erich Affidavit, ¶ 7).

As a result, the "control" issue was never tried.

---

**6.** It should be noted that KDT eventually settled the *Wayne* and *Okun II* consolidated actions.

Moreover, in plaintiff's view, the "minority stockholder" portion of the endorsement does not bar coverage of the *Wayne* and *Okun II* suits. That portion of the endorsement applies to "any claim made by any minority stockholder of the Company." KDT takes a narrow view of the provision in arguing that it should not apply to *all* minority stockholder suits. Rather, the argument goes, the bar against minority suits applies only to those aimed at "any attempt to gain control or from any gaining of control."

In short, the plaintiff would have the Court construe the endorsement so as to bar only those cases, including those brought by minority shareholders, which are aimed at either attempts to gain or the actual gaining of control.

Defendant Home, on the other hand, contends that the *Wayne* and *Okun II* lawsuits fall within the terms of the endorsement for various reasons. First of all, Home points to the specific allegations of the complaints. But for the additional charges that Kittay and the directors used positions of control to cause the corporation to purchase the Cornwall assets at an inflated price, those allegations are identical to the ones in *Okun I,* which, both parties agree, is barred. In Home's view, the additional allegations are insufficient to change the nature of the action from a dispute about "control" to a dispute about the sale of assets.

Secondly, the defendant relies upon the opinion of the Delaware Chancery Court. Since the Chancellor's denial of preliminary injunctive relief was clearly based upon the plaintiffs' failure to demonstrate control sufficient to support their allegation of self-dealing, Home argues that the *Wayne* and *Okun II* lawsuits were "control" cases.

Also, even if the lawsuits cannot be characterized as "control" cases in their entirety, the defendant suggests, the fact that the complaints *raised* the issue of control invokes endorsement provision. The endorsement applies because it encompasses cases which arise both *directly* and *indirectly* from disputes over control of KDT.

Finally, Home points out that both Sidney Wayne and Esther Okun were minority stockholders. The plain and unambiguous language of the endorsement, defendant argues, bars any suit by a minority stockholder, whether or not that stockholder's suit raises the issue of control.

Thus, Home would have the Court interpret the endorsement very broadly. That interpretation would bar claims based upon suits which directly challenge the effort to gain control of the company. Likewise, it seems that the interpretation would extend the endorsement to suits in which control of the company is an issue, albeit, not a primary one. Finally, suits by minority stockholders, even if control is not an issue, would also be excluded under this interpretation.

## IV. *Discussion*

The Court of Appeals for the First Circuit recently prescribed the methodology to be followed in interpreting insurance contracts. In *Eagle-Picher Ind., Inc. v. Liberty Mut. Ins.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028–29, 103 S.Ct. 1279–80, 75 L.Ed.2d 500 (1983), the Court stated:

Insurance policies are generally interpreted in the same way as other contracts. In construing the policies at issue, [the] dominant purpose is to give effect to the intentions of the parties. Where the relevant language is unambiguous and the application of the policy to the relevant facts is clear, that intent must be ascertained by the plain and ordinary meaning of the contract language. Where, however, the policy terms are ambiguous and the coverage issue is reasonably disputed, a court may consider extrinsic evidence of the surrounding circumstances and of the parties' intent. For example, evidence of the construction given to the language by the parties and of the customary usage of persons in the same commercial setting is normally admissible. If the meaning of the policy terms remains unclear, the policy is generally construed in

favor of the insured in order to promote the policy's objective of providing coverage. (footnote and citations omitted). 682 F.2d at 17.

■ This approach reflects the more general rule that exclusionary provisions in insurance policies are to be strictly construed. *See generally, Duggan v. Travelers Indem. Co.,* 383 F.2d 871 (1st Cir.1967) (Massachusetts law); *Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America,* 557 F.2d 1055 (5th Cir. 1977) (Louisiana law); *Sears, Roebuck and Co. v. Reliance Ins. Co.,* 654 F.2d 494 (7th Cir.1981) (Illinois law); *Insurance Co. of North America v. Howard,* 679 F.2d 147 (9th Cir.1982) (Oregon law).

The endorsement at issue in this case is ambiguous in the first instance, not because of the terms used, but because of the way that it is written. The provision begins and ends with references to claims made in connection with the acquisition of control of the company. Somewhere in the middle, however, the defendant inserted a reference to claims made by minority stockholders, and at least on the face of the endorsement, made no effort to disconnect the latter reference from the remainder of the provision. What the defendant left us with is an endorsement, which, in the main, purports to exclude claims based upon the acquisition of control.

■ Had the defendant intended, as it now contends, to exclude *all* minority stockholder claims, whether or not based upon control, then it would have been more reasonable, and indeed more precise, to place the minority stockholder exclusion in its own separate endorsement. Such a distinction was warranted because of the rule that insurers are required to express exclusions clearly, specifically, and unequivocally.[7]

Furthermore, a distinction is necessary in light of the difference in corporations literature between a minority stockholder suit and derivative suit, both of which are likely to involve claims by minority stockholders. The law of corporations recognizes two types of stockholder suits: those in which the stockholder sues to enforce an individual claim, and those in which the stockholder sues, as a representative, to enforce a claim belonging to the corporation which the corporation has not enforced itself because the management is unwilling.[8]

The latter is commonly called a "derivative" suit, since the stockholder derives his claim from the corporation. For example, he has no individual legal right to recover the reduction in value of his shares due to directors' misconduct or mismanagement, since the directors' fiduciary obligations are not normally to the stockholder but to the corporation. Consequently, such rights must be enforced by derivative proceedings in the corporation's behalf, unless there is direct fraud on or misrepresentation to the stockholder as an individual by the directors, in which case there may be a personal right of action. The common name for personal actions is "minority stockholder's suits."[9]

■ Given that the essence of the defendant's endorsement is "control", and further, that the words "minority stockholder claims" are in no way segregated or specifically defined, I find that the exclusion does not extend to all such claims. Rather, only those claims by minority stockholders—whether individually or derivatively made—arising from the acquisition of control are excluded from coverage under the policy.

Inasmuch as I have concluded that "control" is the essence of the endorsement, it is important to address the significance of

---

**7.** *See generally, Wilson v. Insurance Co. of North America,* 453 F.Supp. 732 (N.D.Cal.1978); *Ryder Truck Rental, Inc. v. St. Paul Fire & Marine Ins. Co.,* 540 F.Supp. 66 (D.Ga.1982); *Garman v. New York Life Ins. Co.,* 501 F.Supp. 51 (D.Ill. 1980); *Henning v. Metropolitan Life Ins. Co.,* 546 F.Supp. 442 (D.Pa.1982); *River Services Co. v.*

*Hartford Acc. & Indem. Co.,* 449 F.Supp. 622 (D.Ohio 1977).

**8.** 12 Fletcher, Cyclopedia Corporations §§ 5900–5914 (1980 ed.).

**9.** *Id.*

the words "directly or indirectly" as used therein. The defendant has argued that the effect of these words is to exclude cases in which the acquisition of control is directly in issue, and cases in which the issue arises, perhaps, only incidentally. While I agree with the first part of defendant's argument, the second is troubling. It suggests that if a person gained control of KDT, and at some later point exercised that control to the detriment of the company, then a stockholder suit challenging the detrimental *exercise* of control would arise *indirectly* from the *gaining* of control and would be barred. This Court cannot approve such a sweeping interpretation. As used in the endorsement, the word "indirectly" is vague and ambiguous, and as a result, the insurer now seeks to "indirectly" broaden the reach of the endorsement. To do so would render the policy a nullity, for KDT would have paid substantial premiums for insubstantial coverage. Under the circumstances, a limiting construction of the provision is required.

■ It is no longer debated that majority controlling stockholders are fiduciaries. As such, they may not use their control for ulterior purposes adverse to the interests of the corporation or the minority stockholders. In the context of sales of stock, this rule translates into the view that, in most instances, these stockholders may sell their shares and control without liability for secret profits.[10] As fiduciaries, however they may not transfer control under circumstances in which it would be reasonable to assume that the buyer will harm the corporation or its stockholders.[11] These circumstances, generally referred to as "looting", arise where it is apparent that the buyer intends to raid the corporate treasury, commit fraud upon the corpora-

tion after acquiring control, or implement business policies which would harm the corporation or its stockholders.[12]

■ The "control premium" and "looting" cases provide reasonable guidelines for construing the phrase, "directly or indirectly arising from any attempt to gain control or the gaining of control of the Company," as it appears in the policy endorsement at issue in the instant case. In particular, the "looting" cases strike a balance between Home's argument that the mere *exercise* of control invokes the endorsement, and KDT's argument that once control is acquired, the endorsement's bar is rendered inoperative. The typical "looting" case can be viewed as a situation in which the buyers allegedly have sought to acquire control for the very purpose of subsequently exercising that control so as to harm the corporation or stockholders.[13] This view of "looting" cases is analogous to the undisputed intent of the parties here. That intent was to exclude coverage of claims arising from the tender offer or "Grace situation." This situation has more to do with the price of shares or the immediate results of the takeover than with subsequent, unrelated exercise of control once acquired.

■ In light of this limiting construction, the question now becomes how to characterize the underlying litigation. This is not a difficult task since the Delaware Chancery Court found, and the parties agree that *Wayne* and *Okun II* were self-dealing cases. The complaints do not allege anything in the nature of a conspiracy to "loot" or waste KDT's assets once control of the corporation passed to Sol Kittay and Cornwall. Rather, the primary allegation contained in the complaints is that the corporation was paying too high a price for

**10.** "Usually the controlling interest in a corporation is transferable at a premium, in the sense that the buyer is willing to pay more on a per-share basis than he would be willing to pay if the shares were not part of the controlling block." Hill, *The Sale of Controlling Shares*, 70 Harv.L.Rev. 986 (1957). The article examines some leading sale of control cases, with particular emphasis on those which have held that the secret profit, or control premium, is a corporate

asset that belongs to all stockholders. In these cases, courts have allowed the corporation, and indirectly, minority stockholders, to share in the premium or collect damages.

**11.** *See generally,* Fletcher, at §§ 5805, 5811.

**12.** *See id.*

**13.** *See generally,* cases cited at Fletcher, § 5805.

the Cornwall assets. The Court assumes that the plaintiffs below would have been upset about this particular sale of assets even if there had been no preceding take-over. Furthermore, it seems unlikely that Mr. Wayne and Ms. Okun would have complained if the assets had been properly valued.

As the Delaware Chancery Court explained, in a self-dealing case, the primary issue is the fairness of the transaction. The burden is on the plaintiff to prove that one having a fiduciary relationship with the corporation stood on both sides of the transaction. In the *Wayne* and *Okun II* suits, plaintiffs had the initial burden of establishing, therefore, that the defendant held controlling influence of the corporation. The fiduciaries then had the burden of demonstrating that the Cornwall transaction was scrupulously fair. Their liability, of course, hinged on the fairness of the challenged transaction. Although control was an issue, it was only incidental in that it constituted an element of the plaintiff's burden.

Having found that the endorsement provision, strictly construed, does not exclude coverage for claims arising from the *Wayne* and *Okun II* lawsuits, summary judgment must enter for the plaintiff KDT.

SO ORDERED.