CURTIS UNIVERSAL, INC., Plaintiff,

v.

SHEBOYGAN EMERGENCY MEDICAL SERVICES, INC., d/b/a Orange Cross, St. Nicholas Hospital of the Hospital Sisters of the Third Order of St. Francis, Inc., Sheboygan Memorial Hospital, Inc., Defendants,

and

FIRST NATIONAL INSURANCE COMPANY OF AMERICA, Intervenor-plaintiff,

v.

SHEBOYGAN EMERGENCY MEDICAL SERVICES, INC., d/b/a Orange Cross, Defendant,

and

Insurance Company of North America and Empire Fire & Marine Insurance Company, Third-party defendants.

No. 92–C–1075.

United States District Court, E.D. Wisconsin.

Feb. 22, 1994.

K. Scott Wagner, Hale & Lein, Milwaukee, WI, for Curtis–Universal, Inc.

Michael D. Fischer, James T. McKeown, Foley & Lardner, Milwaukee, WI, for Sheboygan Emergency Medical Services, Inc., d/b/a Orange Cross, Sheboygan Memorial Hosp.

David R. Cross, Harry G. Holz, Darryl S. Bell, Quarles & Brady, Milwaukee, WI, for St. Nicholas Hosp. of the Hosp. Sisters of the Third Order of St. Francis, Inc.

Craig W. Nelson, Nelson, Dries & Zimmerman, Brookfield, WI, for First National Ins. Co. of America.

Timothy A. Bascom, Bascom Law Office, Milwaukee, WI, for Insurance Co. of North America.

Thomas N. Klug, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for Empire Fire & Marine Ins. Co.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on the parties' various dispositive motions regarding the issue of insurance coverage for the defendant, Sheboygan Emergency Medical Services, Inc. d/b/a Orange Cross ("Orange Cross"). In correspondence dated January 12, 1994, the Court notified the parties of its decision that coverage does not exist under any of the policies at issue and stated that a written decision would follow. The following

constitutes the Court's decision and reasoning on the matter.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Curtis–Universal, Inc. ("Curtis"), is an ambulance service company located in Milwaukee, Wisconsin. (Complaint at ¶ 3.) The defendant, Orange Cross, is an ambulance service company located in Sheboygan, Wisconsin. (Complaint at ¶ 4.) As alleged, Curtis seeks damages from Orange Cross (among others) for injuries sustained by reason of the threatened and actual restraint of competition in the Sheboygan area for ambulance services. Curtis alleges Orange Cross violated federal and state antitrust and conspiracy laws and state common law principles. Orange Cross tendered its defense of the action to its three insurers— Insurance Company of North America ("INA"), Empire Fire & Marine Insurance Company ("Empire") and First National Insurance Company of America ("First National"). INA and Empire denied coverage outright and First National accepted the defense under a standard reservation of rights. On INA's motion, the Court bifurcated the coverage and liability issues and stayed all proceedings on the liability issues until coverage was decided. (Court's Order dated November 5, 1993.) For purposes of deciding the coverage issue only, we assume the truth of the allegations contained in the complaint and determine whether such allegations fall within the coverages provided in the policies.

At all relevant times, there were only two hospitals providing health care services to the residents of the City of Sheboygan ("the City") and Sheboygan County ("the County"): Sheboygan Memorial Hospital, Inc. ("Sheboygan Memorial") and St. Nicholas Hospital of the Hospital Sisters of the Third Order of St. Francis, Inc. ("St. Nicholas"). (Complaint at ¶ 7.) Prior to 1987, there was only one private non-emergency ambulance company servicing the City and the majority of the County: Orange Cross, a wholly-owned subsidiary of Sheboygan Memorial.[1] (Complaint at ¶¶ 4, 9–10.) This was all poised to change in 1987, when Curtis entered into negotiations with St. Nicholas to provide ambulance services in direct competition with Orange Cross. (Complaint at ¶ 11.) Things were poised to change further in 1988, when Curtis and other ambulance companies (including Orange Cross) were invited to submit proposals for privatizing the City's emergency 911 ambulance services. (Complaint at ¶ 13.) Curtis alleges that these developments caused Sheboygan Memorial and Orange Cross, in conjunction with St. Nicholas, to combine and conspire together to drive Curtis out of the Sheboygan market and obtain a monopoly over City and County ambulance services.

The actions allegedly taken toward this end were varied, but fall into the following categories. First, about the time Curtis entered into negotiations with St. Nicholas, Sheboygan Memorial and St. Nicholas began discussing the purchase and sale of an ownership interest in Orange Cross. (Complaint at ¶ 11.) That sale was consummated October 21, 1988, with St. Nicholas purchasing a 50% interest in Orange Cross. (Complaint at ¶ 15.) The sole purpose of the sale was to establish Orange Cross as the sole provider of ambulance services to the area's two hospitals. (Id.)

Second, Orange Cross and the hospitals took steps to try and prevent Curtis from obtaining contracts with the City and County to provide 911 emergency services. These included a "campaign of public misinformation" consisting of "defamatory statements about the relative quality of care provided by Curtis and other untrue statements to the media." (Complaint at ¶¶ 24, 51(f), & 74.) They also included a concerted effort to deprive Curtis of a "local medical control".[2]

1. The Sheboygan Police Department provided all emergency 911 service to the City, and Orange Cross provided emergency 911 service for the entire County except for the Plymouth area. (Complaint at ¶ 9.)

2. A "local medical control" is a base hospital which agrees to monitor the care of an incoming patient and assist the ambulance personnel in diagnosis and treatment. (Complaint at ¶ 18.) Depriving Curtis of a local medical control effectively precluded Curtis from providing EMT–I and/or paramedic level services, which were essential to obtaining and/or performing any con-

(Complaint at ¶¶ 18–19, 21–22, 27–30, 40–41.) These actions began about the time that a City committee recommended Curtis for the City contract. (Complaint at ¶ 24; INA's Ex. D at 46–51.) The "campaign" ceased on or before December 31, 1990, when Curtis completely withdrew from the Sheboygan market. (Id.)

Third, after the City awarded Curtis the 911 contract, and after St. Nicholas finally conceded to provide Curtis with local medical control, the hospitals created obstacles designed to reduce Curtis' business in the area and increase its costs. (Complaint at ¶¶ 27–28, 30.) These obstacles were not placed before Orange Cross and included, *inter alia*, imposing a $1000 monthly medical control fee, not allowing Curtis to house its ambulances in St. Nicholas' garage, refusing to use Curtis for patient transfers (even upon a patient's request), refusing to stock Curtis' ambulances with medication, equipment and supplies, directing other health care facilities in the area (such as nursing homes) not to use Curtis and refusing to authorize Curtis personnel to use procedures which were more expensive and therefore more profitable. (Complaint at ¶¶ 28, 31–38.)

The foregoing allegations give rise to eight (8) causes of action against Orange Cross, Sheboygan Memorial and St. Nicholas: (1) Violation of § 1 of the Sherman Act (federal antitrust); (2) violation of § 2 of the Sherman Act (federal antitrust); (3) violation of § 7 of the Clayton Act (federal antitrust); (4) violation of Wis.Stat. § 134.01 (state civil conspiracy); (5) violation of Wis.Stat. § 133.03(1) (state antitrust); (6) violation of Wis.Stat. § 133.03(2) (state antitrust); (7) state common law tortious interference with contract; and (8) state common law breach of contract. (Complaint at ¶¶ 49–83.) Based on these allegations and corresponding causes of action, the Court must decide whether the insurance policies at issue provide coverage.

## LEGAL ANALYSIS

### I. INA AND EMPIRE

█ It is clear that the policies issued to Orange Cross by INA and Empire do not provide coverage. Orange Cross has not suggested that they do. Indeed, the only reason INA and Empire are parties to this action is because First National intervened and joined them as defendants. More importantly, it is undisputed that both the INA and the Empire policies are "occurrence" policies and that all of the "occurrences" involved here took place no later than December 31, 1990, the date by which Curtis completely withdrew from the Sheboygan market. (Complaint at ¶ 24; INA's Ex. D at 46–51.) The coverage periods for the INA and Empire policies did not begin until January 1, 1992 and January 1, 1991, respectively. (INA Ex. C at 1; Empire App.A.) As such, the "occurrences" fall outside the coverage periods and there is no duty to defend or indemnify.

### II. FIRST NATIONAL

#### A. The Policy

The First National policy is a fairly standard Comprehensive General Liability ("CGL") policy. It contains an endorsement providing "personal injury and advertising injury liability coverage". (First National App. at Ex. A; Jones Aff. at Ex. A.) First National and Orange Cross agree that coverage is provided, if at all, under this endorsement:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of **personal injury** or **advertising injury** to which this insurance applies, sustained by any person or organization and arising out of the conduct of the **named insured's** business, within the **policy territory,** and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if the allegations of the suit are groundless, false or fraudulent,....

(Id.; emphasis in original.) The endorsement further defines "advertising injury" and "personal injury", in pertinent part, as follows:

tract with the City or County. (Complaint at ¶¶ 18–19, 21–22, 27–30, 40–41.)

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of a right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.

"Personal Injury" means injury arising out of one or more of the following offenses committed during the policy period:

\* \* \* \* \* \*

(3) à publication or utterance

(i) of a libel or slander or other defamatory or disparaging material, or . . . .

(Id.; emphasis in original.)

## B. General Principles

 The parties dispute whether First National has a duty to defend Orange Cross under the foregoing provisions. The dispute calls into play certain general principles of Wisconsin law governing when an insurance company has a duty to defend its insured.[3] Generally, any doubts regarding the duty to defend, and any ambiguities contained in the insurance contract, must be resolved in favor of the insured. *School Dist. of Shorewood v. Wausau Ins. Cos.*, 170 Wis.2d 347, 364–67, 488 N.W.2d 82 (1992). However, "[t]he insurer is under an obligation to defend only if it could be held bound to indemnify the insured". *Nichols v. American Employers Ins. Co.*, 140 Wis.2d 743, 747, 412 N.W.2d 547 (Ct.App.1987), quoting *Grieb v. Citizens Casualty Co.*, 33 Wis.2d 552, 558, 148 N.W.2d 103 (1967). Thus, "[t]o determine whether an insurer is obligated to·assume the defense of a third-party suit, it is necessary to determine whether the complaint alleges facts which, if proven, would give rise to liability covered under the terms and conditions of the policy." *Sola Basic Industries, Inc. v. United States Fidelity & Guar. Co.*, 90 Wis.2d 641, 646, 280 N.W.2d 211 (1979). A complaint meets this test if "the[ ] allegations . . . state or claim a cause of action for the liability insured against or for which indemnity is paid . . . ." *Grieb*, 33 Wis.2d at 557, 148

N.W.2d 103. As such, "[i]t is the nature of the claim alleged against the insured that is controlling even though the suit may be groundless, false or fraudulent." *Id.*, at 558, 148 N.W.2d 103. This is what is meant by the general statement that an insurer's duty to defend is broader than its duty to indemnify. *See*, Anderson, *Wisconsin Insurance Law*, § 7.1 at 212 (3rd ed.); *see also*, *Elliott v. Donahue*, 169 Wis.2d 310, 320–21, 485 N.W.2d 403 (1992); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1042 (7th Cir.1987). That is, the insurer may be made to defend a lawsuit for which, because the insured wins, it ultimately has no duty to indemnify. Moreover, the insurer will have to defend the entire lawsuit so long as there is one theory of liability that falls within the coverage of the policy. *Shorewood*, 170 Wis.2d at 366, 488 N.W.2d 82.

## C. The Disputes

Unlike the INA and Empire policies, it is undisputed that the "occurrences" involved here fell within First National's policy period. It is also undisputed that the injuries arose "out of the conduct of the named insured's business, within the policy territory". Finally, it is undisputed that the offenses "occurr[ed] in the course of the named insured's advertising activities". (See generally, Orange Cross Brief at 9–12.) The parties dispute, however, whether the definitions of advertising injury and personal injury should be read broadly to provide coverage for *allegations* that sound in slander or unfair competition, even though no such *cause of action* is pled. If not, the parties further dispute whether the complaint states a *cause of action* for unfair competition which is covered by the policy. The Court rules in favor of First National on both counts.

### 1. The meaning of "arising out of".

 The parties' first dispute stems from the policy language defining advertising injury as "injury *aris[ing] out of* libel, slander, defamation, [or] . . . unfair competition", and defining personal injury as "injury *arising*

---

3. While the Court's subject matter jurisdiction is premised solely on the existence of a federal question, it is clear that the coverage issue is purely a matter of state law and is governed by the applicable principles of Wisconsin law.

*out of* ... a libel or slander or other defamatory or disparaging material". First National notes that the complaint contains no express cause of action for libel, slander, defamation, disparagement or unfair competition and thus argues that the injuries did not "arise out of" such an offense. Orange Cross notes that the complaint alleges certain defamatory statements and competitively unfair actions as part of the conspiracy to drive Curtis out of the Sheboygan market. Orange Cross thus argues that, regardless of the names attached to the causes of action, the complaint alleges injuries which—at least in part—"arise out of" covered offenses. The question is whether the phrase "arises out of" requires the pleading of specific causes of action referenced in the policy or simply requires general references to alleged facts "sounding" in slander or unfair competition.

Decisions from the Wisconsin Supreme Court are not entirely clear on the issue. Most decisions focus on the "cause of action", the "theory of liability" or the "nature of the claim" as the basis for coverage. *See e.g., Grieb,* 33 Wis.2d at 557–58, 148 N.W.2d 103 ("the[ ] allegations must state or claim a *cause of action* for the liability insured against"); *Shorewood,* 170 Wis.2d at 366, 488 N.W.2d 82 ("the insurers are obligated to defend the entire action if just one *theory of liability* appears to fall within ... coverage"); *Elliott,* 169 Wis.2d at 321, 485 N.W.2d 403 ("[t]he duty to defend depends on *the nature of the claim* "). Wisconsin appellate courts relying on these cases also focus on the "cause of action" or the "nature of the claim" as the means to determine coverage. *See Nichols,* 140 Wis.2d at 750–51, 412 N.W.2d 547; *Qualman v. Bruckmoser,* 163 Wis.2d 361, 365–66, 471 N.W.2d 282 (Ct.App. 1991). Moreover, legal commentators interpret Wisconsin law as employing a "cause of action" test for coverage. Anderson, *Wisconsin Insurance Law,* § 7.1 at 211 (3rd ed.) ("[i]n Wisconsin, ... an insurer's duty to defend is determined by whether the coverage provided by the policy covers the *cause of action* alleged in the complaint"). Yet one can cite language, as Orange Cross does, which seems to focus attention on the underlying facts of the complaint, regardless of the

cause of action pled. *See e.g., Newhouse v. Citizens Security Mut. Ins. Co.,* 176 Wis.2d 824, 835, 501 N.W.2d 1 (1993) ("[t]he duty to defend is triggered by *the allegations* contained within the four corners of the complaint"); *Sola Basic,* 90 Wis.2d at 646, 280 N.W.2d 211 ("it is necessary to determine whether the complaint *alleges facts* which, if proven, would give rise to liability covered under the terms and conditions of the policy").

In resolving this issue in the context of the present case, the Court finds the reasoning in the *Nichols* case persuasive. In *Nichols,* a female employee filed a Title VII administrative complaint against her employer for sexual harassment. There was no cause of action for defamation and nothing in the administrative complaint referenced any defamatory conduct as part of the underlying harassment. The examiner's initial report, however, referenced evidence of defamatory statements by co-employees and supervisors as part of the alleged harassment. Based on that report the employer tendered its defense of the action to its insurer, relying upon the alleged defamatory statements and the insurance policy's "personal injury" coverage, which was identical to that provided here (including the "arising out of" language). The insurer denied coverage, and the Court of Appeals upheld the decision, reasoning that the language of the personal injury provision contemplates coverage for defamation *suits,* not factual allegations sounding in defamation:

> Nichols claims neither policy requires that a civil suit *for* defamation, libel or slander be commenced before a claim for personal injury arises. Rather, both policies simply require that the facts within the claim be based upon a libel, slander or defamation. If that happens, coverage exists. Nichols concludes that, in this case, the claim for personal injury under the terms of the policies arose out of a slander which gave rise to a charge of sexual harassment.

We again disagree. Contrary to Nichols' assertion, we read the insurance policy as contemplating defense of defamation suits, not suits claiming damages where a defamatory statement may be involved.

The American policy, for instance, indicates that the insurer will defend "any suit" seeking damages "on account of" libel or slander. The policy does not say that it will defend actions seeking damages other than for defamation but which have some defamatory matter contained within the allegation.

*Nichols,* 140 Wis.2d at 750, 412 N.W.2d 547. First National's policy contains the same language relied upon in *Nichols.* As in *Nichols,* Curtis does not seek damages for "any suit" or cause of action of defamation, slander or unfair competition. Instead, Curtis seeks damages for antitrust, conspiracy, tortious interference and breach of contract causes of action which allege some defamatory matter and unfair business practices within their numerous other factual allegations. Thus, as in *Nichols,* any resulting damages would not be "on account of" libel or slander or unfair competition, but rather "on account of" these other causes of action.

■ Orange Cross argues that *Nichols* runs directly contrary to Wisconsin Supreme Court decisions and case law in the 7th Circuit and thus should not be followed. First, as explained above, the Wisconsin Supreme Court has never clearly addressed this issue and, in fact, much of the language from prior Supreme Court decisions supports the reasoning in *Nichols.* As for the 7th Circuit, Orange Cross relies on the *Tews* decision, cited earlier. In *Tews,* the 7th Circuit found, under similar policy language, a duty to de-

fend certain antitrust claims which were based in part on factual allegations of defamatory statements. The complaint also included state common law claims for tortious interference with contracts and other business relations. But *Tews* involved an interpretation of Illinois law and thus is not directly on point. More importantly, the holding of the case is that insurers have a duty to defend antitrust suits when other common law *causes of action* are pled which are covered by the policy.[4] *Tews,* 832 F.2d at 1043. The basis for the holding was the principle that an insurer must defend against any non-covered claims so long as there is one "theor[y] of recovery" which falls within the coverage of the policy.[5] *Id.,* at 1042–43. Nothing in *Nichols,* nor in the Court's decision today, contradicts this holding.

The Court acknowledges, however, that its decision conflicts with authorities found outside this jurisdiction. *See generally, Ethicon, Inc. v. Aetna Casualty & Surety Co.,* 737 F.Supp. 1320, 1329 (S.D.N.Y.1990) ("if the underlying facts and allegations ... aver[ ] a pattern of activity which would, if pled as a common law claim, be covered under the policies at issue ... then [the insurer] ha[s] a duty to defend"); *CNA Casualty of California v. Seaboard Surety Company,* 176 Cal.App.3d 598, 606, 222 Cal. Rptr. 276 (Cal.Ct.App.1986) ("the insurer's duty is not measured by the technical legal cause of action pleaded ... but rather by the potential for liability under the policy's cover-

4. In this regard the 7th Circuit found, by implication and without discussion, that the alleged common law claims for interference with the right to pursue a lawful business and with potential and existing contractual relations constituted claims for "unfair competition" as used in the definition of advertising injury. *Tews,* 832 F.2d at 1040, 1043. It seems the parties never raised the issue, however, which is probably why the 7th Circuit never addressed it. If the issue had been raised, as it is later in this opinion, the Court does not believe the 7th Circuit or, more importantly, the Wisconsin Supreme Court would have read the policy reference to "unfair competition" so broadly. (See, section II(C)(2)(c), *infra.*)

5. Although not central to its holding, the 7th Circuit made certain statements which implied that, even if the covered common law claims were not pled as causes of action, but simply could be constructed by the Court from factual

allegations contained in the antitrust claims, coverage would be triggered. *Id.,* at 1044. This is certainly inconsistent with *Nichols.* In the absence of clear authority from Wisconsin's Supreme Court, this Court is bound to follow *Nichols,* a state appellate court decision, so long as it is a sound and defensible prediction of how the Wisconsin Supreme Court would rule on the matter. *See generally, McCoy v. Richards,* 771 F.2d 1108, 1110 (7th Cir.1985); *Johnson v. Safeco Insurance Co.,* 809 F.Supp. 602, 604 (N.D.Ill. 1992). The Court believes it is, given the frequent references by the Wisconsin Supreme Court to the "cause of action" or "theory of liability" as the basis for coverage. (See, section II(B), *supra.*) Moreover, the 7th Circuit never discussed *Nichols* in the *Tews* decision, perhaps because the state court's decision was issued only four months prior to the federal court's decision.

age as revealed by the facts"). The *CNA* case is particularly representative of this position because it emphasizes the "potential of liability" as affording the basis for coverage. This "potential" is found in the fact that a complaint may change over the course of a lawsuit:

> The pleadings are malleable, changeable and amendable.... [C]ourts do not examine only the pleaded word but the potential liability created by the suit....
>
> * * * * * *
>
> At the time of tender, despite the federal court's dismissal of the pendant second cause of action, the possibility that the complaint could still be amended had not been precluded. Federal antitrust complaints are frequently amended to include causes of action for defamation, malicious prosecution, trade disparagement, unfair competition or idea misappropriation.

*CNA*, 176 Cal.App.3d at 607, 611, 222 Cal. Rptr. 276.

This Court believes that basing the duty to defend on the possibility that the complaint could be amended some time in the future to include a cause of action covered under the policy misinterprets and, in some cases, ignores well-established principles governing the purpose and construction of insurance policies. While it is frequently stated that the duty to defend is triggered by the mere "possibility" or "potential" of liability, this statement is usually shorthand for the well-established principle that a cause of action *otherwise covered by the policy* triggers the duty to defend even though there are clear and obvious defenses which render the claim groundless. It simply means that the merits of the underlying claim, while determinative of the insurer's duty to indemnify, have no affect on the duty to defend. It is another thing entirely to interpret the phrase to mean that there may be a duty to defend even where the claim itself, regardless of its merits, falls outside the coverage of the policy:

> ... the insurer is generally required to defend suits against the insured which the pleadings show to be within the policy coverage, even though such suits be groundless, false or fraudulent. But a distinction must be drawn between groundless suits, and actions which, even if successful, would not be within policy coverage. Since the insurer's duty to defend ordinarily is correlative with its duty to pay a judgment which might be obtained against the insured, it is apparent that the insurer has the duty of defending only those actions that are within the terms of the policy, ....
>
> * * * * * *
>
> As with all generalizations, the duty to defend is not without limit and an insurer cannot be properly required to defend litigation unrelated to the risks it has insured against. The duty to defend "groundless" claims is not extended without limit and requires a defense of only those claims covered by the policy.

Appleman, *Insurance Law and Practice*, Vol. 7C, § 4684 at 72–73, 88 (Berdal ed.).

Both the duty to defend and the duty to indemnify require the pleading of a covered claim. But finding the covered claim in a hypothetical amendment of the complaint, as *CNA* does, seems to make little sense and bad policy. Every antitrust complaint will contain allegations that could theoretically be reshaped into a common law unfair competition claim or other business tort. One might as well say that CGL policies cover antitrust liability, a conclusion that neither *Tews*, *Ethicon* or *CNA* was willing to draw. More importantly, such a rule introduces complete uncertainty into the process, and not just for insurers, but for courts too. How liberal or creative should a court be when considering whether a covered claim' can be found in the allegations of a complaint? How specific must the facts or allegations be? Must they form a substantial portion of the complaint or can they be—as here—simply a few references contained in a few allegations forming a small part of the whole?

█ Answers may exist for such questions, but the point is that they lead us away from the more important question of what a reasonable interpretation of the policy requires. As *Nichols* stated, "[i]nsurance policies should be given a reasonable interpreta-

tion and not one which leads to absurd results." *Nichols*, 140 Wis.2d at 751, 412 N.W.2d 547. "[T]he test to be imposed is one of reason, in all events—that is, whether the defense sought is for a coverage which the insured desired to purchase and for which he paid premiums, and the ultimate determination should be one which is fair to all contracting parties." Appleman, § 4683.01 at 69. While doubts about the duty to defend should be resolved in favor of the insured, "the insurer should not be required to defend an insured in a suit in which the insurer has no economic interest." *Shorewood*, 170 Wis.2d at 364, 488 N.W.2d 82. The latter is what results from the rule stated in *CNA*. It requires the insurer to defend the insured, based on the "potential" for covered claims being pled, even though there is no possible duty to indemnify under the policy for the claims currently pled. This is error. Failure to plead a covered claim precludes all duties under the policy. Thus, the correct and better rule in cases like this is not to require the insurer to pick up the cost of defense until a covered claim is pleaded.[6]

### 2. The meaning of "unfair competition".

Orange Cross alternatively argues that, even if the policy requires the actual pleading of a covered cause of action, the complaint contains several causes of action for "unfair competition", one of the theories of liability listed within the definition of advertising injury. Orange Cross points to the several antitrust actions and argues that such statutory claims fall within the general rubric of unfair competition. Orange Cross also points to the common law tortious interference with contract claim as falling within the scope of unfair competition. First National denies that the foregoing are claims for "unfair competition" as defined in the policy. The Court rules in First National's favor, agreeing with the reasoning of the California Supreme Court in *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992).

### a. Bank of the West.

*Bank of the West* involved a coverage issue on a CGL policy using the same definition of "advertising injury" as that involved here. The facts of the case involved a California bank which offered to loan money for the purpose of paying auto insurance premiums. The offer, however, was made to various insurance agents, who were then given the incentive to sell such financing to their customers. Problem was, few customers were told about the loans and most thought they were simply paying in installments. When it was discovered that these installments were actually loan payments, and that the interest rates were in excess of % 120, a lawsuit was filed. The claims were all statutory in nature, including claims under California's Unfair Business Practices Act ("UBPA"). Just prior to settlement, the Bank tendered defense of the action to its insurer, arguing that the UBPA claim fell within the policy's cover-

---

**6.** This is consistent with the notion that "the insurer [is] obligated to defend the entire action if just one theory of liability appears to fall within the coverage of the policy." *Shorewood*, 170 Wis.2d at 366, 488 N.W.2d 82. In such cases, it is generally thought that the duty to defend ceases when the theory of liability which triggered coverage is dismissed from the case because "the initial election to defend did not obligate [the insurer] to furnish a complete and continuing defense". Appleman, § 4683 at 57. "[C]onversely, an amended complaint may require a defense" where the original complaint did not, and thus it is said that the "duty to defend may attach at any stage in the proceedings." Id.

This, of course, means that the scope of the duty to defend will be somewhat dependent upon the language and scope of the third-party's pleadings. But that is always the case. The question is necessarily one of degree. The Court is not advancing a hyper-technical approach wherein the exact name of a given cause-of-action must be found word-for-word in policy language providing coverage. Coverage should not be created or defeated by unartful pleadings. For instance, if an analysis of the allegations contained within a given cause-of-action demonstrate that the plaintiff intended or attempted to state a claim for unfair competition or slander, but simply did not label it as such, the duty to defend would attach. Similarly, if the plaintiff labelled his claim as one for unfair competition, but the facts alleged in support thereof clearly show that the claim is simply one for breach of contract, the duty would not attach. But where, as here, there is no apparent intention to plead a claim for defamation or unfair competition (as used in the policy), there should be no suggestion of the duty attaching.

age for advertising injuries arising out of "unfair competition". The trial court interpreted the policy as referring only to the common law claim for unfair competition and ruled against coverage. The appellate court reversed, finding the reference to "unfair competition" ambiguous and thus construing the term against the insurer. The California Supreme Court reversed again, finding no ambiguity and agreeing with the reasoning of the trial court:

> The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection.... the tort also includes acts analogous to "passing off", such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market.
>
> \* \* \* \* \* \*
>
> The majority of published opinions ... hold that insurance coverage for "advertising injury" due to "unfair competition" is limited to claims under the common law and excludes statutory claims. The Bank takes issue with these holdings. Because the CGL policy does not define "unfair competition", that term, according to the Bank, is ambiguous and must be construed against the insurer.
>
> \* \* \* \* \* \*
>
> ... a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. This is because "language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."
>
> It is obviously possible to argue that the term "unfair competition," in the abstract, might refer to statutory claims. As the

Bank correctly observes, policy terms must be read in their "ordinary and popular sense" ... and definitions of "unfair competition" in standard dictionaries generally include acts that harm the public as well as acts that harm competitors only....

> While the foregoing argument is probably correct as a matter of abstract philology, it is defective as a matter of policy interpretation because it disregards the context. The policy does not purport to cover "unfair competition" in the abstract; instead, it covers "damages" for "advertising injury" caused by "unfair competition." Read in this context, the term "unfair competition" can only refer to a civil wrong that can support an award of damages.

Bank of the West, 10 Cal.Rptr.2d at 544–45, 833 P.2d at 551–52. (Emphasis supplied; citations omitted.)

Orange Cross argues that Bank of the West is irrelevant because it is an interpretation of California law. This overstates the case. Bank of the West may not be authoritative, but it is hardly irrelevant. No Wisconsin court has addressed the Bank of the West issue, and virtually every court that has addressed it ruled against coverage. Thus, while this Court must restrict itself to a prediction of how the Wisconsin Supreme Court would decide the case, it may, when doing so, give serious consideration to the sound reasoning and virtually unanimous trend of courts outside Wisconsin.

### b. The statutory claims.

Orange Cross argues that statutory antitrust claims fall within the rubric of unfair competition and therefore are covered under the policy. It cites decisions from the United States Supreme Court permitting the Federal Trade Commission ("FTC") to prosecute civil antitrust claims as methods of unfair competition. See e.g., FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); FTC v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). But the definition of unfair competition for purposes of the FTC's prosecutorial powers has little to do with the meaning of unfair competition as used in the policy. It may be true that, as a matter of general legal parlance, the

phrase "unfair competition" has come to refer to a number of business torts and statutory violations regulating the manner in which business is conducted in this country. But as a matter of contract interpretation, as stated in *Bank of the West,* "the court must interpret the language in context, with regard to its intended function in the policy." *Bank of the West,* 10 Cal.Rptr.2d at 545, 833 P.2d at 552; *see also, Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 744, 456 N.W.2d 570 (Wis.1990) ("we must first determine whether the language is ambiguous when used in the context of the policy's exclusionary clause"). Here, the term unfair competition "appears ... alongside a host of readily identified common law torts including libel, slander, defamation and piracy." *Nationwide Mut. Ins. Co. v. Dynasty Solar, Inc.,* 753 F.Supp. 853, 857 (N.D.Cal.1990). This positioning has led the majority of courts to conclude that "the only reasonable interpretation of unfair competition which emerges ... is the common law definition relating to the taking and using as one's own that which belongs to one's competitor." *Id.; see also, Standard Fire Ins. Co. v. Peoples Church of Fresno,* 985 F.2d 446, 450 (9th Cir.1993). The Court agrees with this conclusion and finds that the placement of the term within a list of specific common law torts negates a definition of the term that would include statutory claims.

Orange Cross tries to distinguish *Bank of the West* and its progeny on the grounds that those cases dealt with consumer protection statutes, which regulate a company's conduct vis-a-vis its *customers,* not its *competitors. Bank of the West* and others noted this distinction when stating that the definition of unfair competition in consumer protection statutes "cannot be equated with the common law definition" because the latter required a showing of "competitive injury". *Bank of the West,* 10 Cal.Rptr.2d at 544, 833 P.2d at 551; *Standard Fire,* 985 F.2d at 450 ("[a]dvertising injury within this context is injury inflicted on a competitor and not simply on a customer"). Orange Cross also distinguishes *Bank of the West* on the grounds that the statutory claims involved therein, because they were consumer oriented, did not provide for "damages" but only for the "disgorge-

ment" of any monies wrongfully obtained. This took the claims outside of the policy language because coverage is only provided for "damages" arising out of advertising injury. *Bank of the West* discusses this distinction in detail and concludes therefrom that "the term unfair competition can only refer to a civil wrong that can support an award of damages." *Id.,* at 545, 833 P.2d at 552. Thus, because the statutory antitrust and conspiracy claims involved here seek "damages" for "competitive injuries", Orange Cross argues, *Bank of the West* actually compels a finding of coverage. This Court agrees with those that have rejected the foregoing interpretations of *Bank of the West.* As discussed above, critical here is the context in which the phrase "unfair competition" is used in the policy. The only interpretation fully consistent with the placement of that phrase within a list of other common law torts is that which limits the policy's coverage to common law claims:

> The *Bank of the West* decision also cites with approval the majority view that coverage for advertising injury arising out of unfair competition is limited to common law claims.... Read as a whole, the *Bank of the West* opinion indicates that California law follows the majority rule that "unfair competition" in advertising injury coverage refers to the common law tort. We therefore reject the argument ... that *Bank of the West* stands for the broad proposition that "unfair competition" refers to any civil wrong that can support an award of conventional damages.

*Standard Fire,* 985 F.2d at 449. (Citations omitted.)

### c. The common law claim.

Finally, even if we limit coverage to common law claims of unfair competition, Orange Cross argues that Curtis' seventh cause of action, alleging tortious interference with its 911 contract with the City, qualifies as such a claim. Orange Cross posits two explanations for this conclusion. First, it contends that Wisconsin's version of the common law tort is more expansive than California's and includes claims for tortious interference with contract. Second, Orange Cross argues that

the tortious interference claim is based—at least in part—on actions analogous to the "passing off" or "misappropriation" element of unfair competition, and thus qualifies as such a claim. Both contentions are without merit.

*Bank of the West* and its progeny "concluded that unfair competition as it relates to advertising injury in CGL policies refers to the common law tort—'passing off' one's goods as those of another." *Standard Fire*, 985 F.2d at 449; *see also, Bank of the West*, 10 Cal.Rptr.2d at 544, 833 P.2d at 551 ("[t]he common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another"). According to these cases, the tort may also include "acts analogous to 'passing off', such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market." *Bank of the West*, 10 Cal.Rptr.2d at 544, 833 P.2d at 551. First National argues that Curtis' tortious interference action is clearly not a "passing off" claim and therefore does not trigger coverage. Orange Cross argues that Wisconsin's tort of unfair competition is broader than the California version relied on in *Bank of the West* and has grown to include claims of slander and tortious interference.[7] Although earlier Wisconsin decisions describing the tort incorporate the "passing off" element (See, First National Brief in Support at 22–27), later decisions have moved away from such a requirement and contain language expanding the concept of unfair competition:

> *I.N.S.* [*v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211] eliminated "passing off" as a requirement and: "... postulated a new concept of unfair competition in focusing upon the competitive relationship and stressing the reciprocal rights and duties that are peculiar to it and emanate from it".... The majority in *I.N.S.* recognized two new causes of action differing from the "passing off" doctrine, "causes of action based upon the misappropriation and the exploitation of a competitor's business values."

The elements of the misappropriation cause of action developed in *I.N.S.* are: (1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff.

*Mercury Record Productions, Inc. v. Economic Consultants, Inc.*, 64 Wis.2d 163, 173–74, 218 N.W.2d 705 (1973); *see also, Culligan, Inc. v. Rheaume*, 268 Wis. 298, 307–08, 67 N.W.2d 279 (1954) ("[i]t would appear that counsel ... have not fully comprehended the scope of the cause of action for unfair competition.... [t]he [defendant's] intent or success in diverting trade from another may be shown by such acts as his imitation of the plaintiff's trade-mark, his betrayal or unlawful obtention of plaintiff's trade secrets, *interference with plaintiff's contracts, slander of plaintiff's reputation, etc.*"); *Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 948 (7th Cir.1986) ("[i]n cases where no breach of contract results from the interference, the tort [tortious interference] is really a branch of the law of unfair competition").

The problem with Orange Cross' argument is that it ignores the context. The question is not simply whether the tort of unfair competition is expanding under Wisconsin law to include claims of slander and tortious interference. The question is what is meant by the term unfair competition as used in the policy and in the context of its placement therein. And important here is the fact that the term "is nestled within a group of torts in the advertising injury provision which all involve *disparagement* or *appropriation* of another's name, style, identity, or other forms of representation of products". *Standard Fire*, 985 F.2d at 450. These torts include "libel, slander, defamation, violation of right of privacy, piracy, misappropriation of idea, and infringement of copyright, slogan or title." *Id.*, n. 4. This leads the Court to two logical conclusions. First, the items listed were not intended to be redundant or superfluous, so "unfair competition"—*as used in the policy*—means something different than

7. The Court notes the potential "slander" aspect of unfair competition because plaintiff's tortious interference claim is based, in part, on allegations sounding in slander or defamation. (Complaint at ¶ 74.)

"libel", "slander" or "defamation". Given this, and the traditional concept of the tort as being one of "passing off" one's goods as those of another, the Court finds that the term falls within the misappropriation aspect of advertising injury, as opposed to its disparagement aspect.[8] Second, the fact that the "misappropriation" must take place by means of "advertising" implies that what must be misappropriated is "another's name, style, identity, or other forms of representation of products", not merely another's contract. *Id.* Therefore, as a general matter, tortious interference with contract claims (even those based—in part—on allegations of slander) are not claims for unfair competition as used in the policy.

Even so, Orange Cross argues that Curtis' tortious interference claim is based, at least in part, on actions analogous to "passing off" or "misappropriating" Curtis' name, style, identity or other forms of representation. Orange Cross is referring to the allegation that it interfered with Curtis' 911 contract with the City by "campaigning" the public to call 911 and ask for Orange Cross. (Complaint at ¶ 74.) This allegation clearly details the misappropriation of a contract, not a name, reputation or other product representation. That is, there is no allegation (and could be none) that "911" is somehow a trademark or other representation of Curtis' services. "911" is a term and program developed by municipalities, here Sheboygan, which in turn contracted out the underlying emergency services. Use of the term may implicate a Curtis contract, but it does not implicate Curtis' business identity. Nor is there any other alleged advertising by Orange Cross that somehow misappropriated or exploited Curtis' name or reputation. Thus, the proposed analogy fails. Curtis' tortious interference claim is simply not a claim for unfair competition as that term is used in the policy.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Sheboygan Emergency Medical Services, Inc.'s motion for summary judgment is denied;

2. First National's motion for judgment on the pleadings is granted;

3. Empire Fire's motion for declaratory judgment of non-coverage is granted;

4. Insurance Company of North America's motion for summary judgment is granted.

**SO ORDERED.**

---

8. Indeed, this is entirely consistent with *Mercury's* revised definition of the elements of an unfair competition claim. *Mercury* stated that the traditional element of "passing off" was replaced or expanded by the concepts of "misappropria-

tion" or "exploitation" of another's work or business values. *Mercury,* 64 Wis.2d at 173–74, 218 N.W.2d 705. It said nothing regarding "disparagement" of another's product or business.