HOWARD, WEIL, LABOUISSE, FRIED-
RICHS, INC., Plaintiff-Appellee
Cross Appellant,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Defendant-Appellant
Cross Appellee.

No. 75–2003.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1977.

Eugene R. Preaus, Rutledge C. Clement, Jr., New Orleans, La., for plaintiff-appellee cross appellant.

Earl S. Eichin, Jr., Chas, Kohlmeyer, Jr., New Orleans, La., for defendant-appellant cross appellee.

Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Howard, Weil, Labouisse, Friedrichs, Inc. (Howard), a broker of securities and commodities, brought this diversity action against the Insurance Company of North America (INA) to recover on a brokers' blanket bond. Howard had absorbed $154,-405 in trading losses which had occurred when one of its employees, using his position as a broker, speculated to the point of insolvency in the commodities market. Howard sought indemnification for the losses under the bond provision insuring it against employee dishonesty.[1] After a bench trial, INA was held liable on the

bond, and a judgment was entered against it for the entire claim less $35,000, the deductible stipulated in the bond, and $6,673.98, representing the commissions Howard would have been obligated to pay the broker were it not for his dishonesty.[2]

INA has appealed, contending that the bond did not cover the losses incurred for two reasons: the broker's actions were not dishonest or fraudulent; the broker's actions were committed in his capacity as a customer rather than as an employee of the insured. Alternatively, INA contends that, if the losses are covered, the $35,000 deductible should have been applied to the loss attributable to each incident of employee misconduct rather than to the total loss generated by the trading episode. Howard has cross-appealed, contending that the district court erred in failing to declare the deductible provision void for ambiguity; in not awarding it attorneys' fees or a penalty as prescribed by Louisiana law;[3] and in awarding interest only from the date of judicial demand for payment. We conclude that the contentions raised on appeal are without merit and affirm.

I

The facts in this case are set out in explicit detail in the district court's opinion,[4] and our reference to them will be brief. The broker whose trading losses gave rise to the present litigation was Jess Ben Latham III, a commodities solicitor and registered representative in Howard's branch office in Amarillo, Texas. As with most of Howard's brokers, he had a personal commodity account referred to as a "house account". During a December 1972 trip to Chicago, Latham utilized Howard's membership in the Chicago Board of Trade to

---

1. The bond covered, inter alia, "Loss through any dishonest or fraudulent act of any of the Employees (of Howard), committed anywhere and whether committed directly or by collusion with others, including loss of Property through any such act of any of the Employees."

2. *Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America*, 397 F.Supp. 1279 (E.D.La.1975).

3. See La.Rev.Stat.Ann. § 22:658 (West). For the full text of the statute, see note 7 *infra*. The parties agree that Louisiana law controls the disposition of all substantive issues in this diversity action.

4. 397 F.Supp. at 1280–1283.

enjoy a four-day speculative spree in the soybean futures market.[5] With his Howard connections, he gained access to the floor of the exchange and consummated the following transactions:

| Date | Time Executed | Bought | Sold | Price | Loss |
|---|---|---|---|---|---|
| 12/11/72 | 9:38 | 20M July | | 429–½ | |
| 12/11/72 | 9:42 | | 20M July | 426 | $ 725 |
| 12/11/72 | 11:47 | 40M July | | 426–½ | |
| 12/11/72 | 11:47 | 10M July | | 426–¼ | |
| 12/11/72 | 12:28 | | 50M July | 418 | 4,355 |
| 12/11/72 | 12:30 | | 50M July | 418–¼ | |
| 12/11/72 | 12:37 | | 70M July | 421–¼ | |
| 12/11/72 | 12:37 | | 30M July | 421–½ | |
| 12/12/72 | 10:21 | | 150M July | 430 | |
| 12/12/72 | 12:38 | 300M July | | 434–½ | 30,425 |
| 12/12/72 | 12:40 | 150M July | | 434–¾ | |
| 12/12/72 | 12:40 | 150M July | | 434–¾ | |
| 12/13/72 | 10:11 | 300M Jan. | | 437 | |
| 12/13/72 | 11:19 | 300M Jan. | | 433 | |
| 12/14/72 | 10:28 | | 250M Jan. | 425 | |
| 12/14/72 | 10:28 | | 350M Jan. | 424–½ | 65,350 |
| 12/14/72 | 10:28 | | 150M July | 417–½ | |
| 12/14/72 | 10:28 | | 150M July | 417 | 53,550 |
| | | | | Total | $154,405 [6] |

All parties agree that these transactions amounted to heavy speculation and that Latham had the misfortune of guessing every turn in the market poorly. It is also agreed that Latham's trades increased markedly as he tried to recoup his losses and turn a profit.

The heart of the dispute lies in the significance to be attached to Latham's conduct at the beginning of each day of trading, i. e., whether his conduct was dishonest or fraudulent. One of Howard's operating rules required that every customer whose account was maintained in an open position pay Howard at the beginning of each business day the amount of any deficit balance in his account and deposit $1,200 for every futures contract being held. The purpose of the rule was to insure that Howard would not bear the ultimate responsibility for any trading losses that might be sustained by these open accounts. On each day of Latham's trading spree Howard called upon him to cover the previous day's losses and to pay a deposit for the contracts remaining in his account. Latham responded with personal checks drawn to Howard's order on an inadequate bank account. His checks for $41,080 on December 12 and for $68,405 the following day were worthless. On the 14th, when Howard demanded $280,020, Latham said that he could not pay it and that he had stopped payment on the two previous checks. Thus the spree ended. Latham was insolvent, and Howard suffered losses of $154,405.

## II

The district court had little difficulty in finding that the losses were caused by the

---

**5.** For a description of how the Chicago commodities market operates, see *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971), and *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962).

**6.** Included in the total losses are the commissions Howard would ordinarily have paid Latham, its broker.

fraudulent and dishonest conduct of Latham, acting as a Howard employee, and thus in concluding that the losses were covered by the bond. INA submits that this finding has no support in the record. Latham's conduct is said to have fallen short of dishonesty or fraud because he was merely gambling and at no time intended or even contemplated injury to Howard. Moreover, even if his actions could be labeled dishonest or fraudulent, INA contends that coverage still does not exist because Latham was trading not as a Howard employee, but as its customer. Indeed, it is argued that at no time did Latham take advantage of his employment to do anything that an ordinary customer could not do.

■ Both of these arguments are without merit. Latham used Howard's credit to enable him to trade for four days. He engaged in this activity with the knowledge that, if he sustained a substantial loss, Howard would eventually have to assume it. Furthermore, in order to enjoy the continued use of Howard's credit, Latham gave Howard checks drawn on an account with insufficient funds. This fact belies INA's claim that Latham received nothing of value in exchange for the checks. What he received was the right to continue trading on his house account, and he received this benefit by the deliberately deceptive device of writing bad checks. This is fraudulent and dishonest conduct. *See Citizens State Bank v. Transamerica Ins. Co.*, 452 F.2d

199, 203 (7th Cir. 1971); *National Bank of Commerce v. Fidelity and Casualty Co.*, 312 F.Supp. 71 (E.D.La.1970), *aff'd per curiam*, 437 F.2d 96 (5th Cir. 1971).

■ INA's alternative argument—that Latham was not acting as an employee—is equally transparent. The bond covered any "[l]oss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed directly or by collusion with others." This language would clearly embrace a collusive broker-customer arrangement to allow the customer to speculate at the expense of the broker's employer by meeting trading calls with bad checks. If the broker carried out such a scheme to the detriment of his employer, thus breaching a fiduciary obligation implicit in his employment, any loss incurred by his employer would unquestionably fall within the employee dishonesty coverage of the bond. The only difference between this example and the case before us is that here the broker and the customer are one and the same. We can see no legal distinction in the behavior of the broker in the two situations. Each constitutes employee fraud or dishonesty.

### III

We next reach the question of the enforceability and application of the deductible provision. While the bare insurance policy does not include a deductible, a form rider attached to the policy limits INA's liability to losses in excess of $35,000.00.[7]

---

7. The deductible is couched in this language:

In consideration of the premium charged for the attached bond, it is hereby agreed that:

1. The Underwriter shall not be liable under the attached bond on account of any loss or losses specified in the Non-Reduction of Liability Section [Section 7 of the Bond] of the attached bond, unless the amount of such loss or losses, after deducting the net amount of all reimbursement and/or recovery obtained or made by the Insured, other than from any bond or policy of insurance issued by a surety or insurance company and covering such loss or by the Underwriter on account thereof prior to payment by the Underwriter of such loss or losses, shall exceed in the aggregate the sum of Thirty five thousand and No/100 Dollars ($35,000.00) and then the

Underwriter shall be liable under the attached bond, as modified by this rider, for such excess only, but in no event for more than the amount of indemnity carried under the attached bond on such loss or losses.

2. The amount set forth above shall be deducted from any recoveries to which the Insured is entitled in accordance with the Section of the attached bond entitled "Distribution of Salvage".

3. The Insured shall, in the time and in the manner prescribed in the attached bond, give the Underwriter notice of any loss coming within the terms of the attached bond, whether the Underwriter is liable therefor or not, and upon the request of the Underwriter shall file with it a brief statement giving the particulars concerning such loss.

Howard argues that the deductible provision is ambiguous and therefore totally unenforceable. It commences its argument by pointing to the following directive appearing on the face of the rider in bold print:

DEDUCTIBLE RIDER FOR USE WITH BROKERS BLANKET BOND FORM 14 BROAD WHEN ISSUED AS EXCESS COVERAGE AND SUBJECT TO A DEDUCTIBLE AMOUNT–DISCOVERY FORM ONLY. NOT TO BE ATTACHED MID–TERM.

This directive, it is urged, renders the deductible applicable only where the bond is issued as excess coverage; and since the bond here afforded primary, not excess coverage, the rider should be considered a nullity.

■ To be sure, the directive indicates that the form is to be used as a rider to a bond issued as excess coverage. It is obviously a guide to the insurance agent in assembling a policy to meet his client's needs. There is nothing in the language of the deductible provision, however, which would preclude its use with the type of bond issued to Howard. Although the directive itself obviously has no application in this case, the terms of the rider clearly provide a deductible in the amount of $35,000. Under Louisiana law, such a deductible created by rider must be given effect:

"The rider would not have been attached to the policy, if not for the purpose of specification." *Farr v. Pacific Mutual Life Insurance Co.*, 197 La. 111, 200 So. 865, 867 (La.1941).

■ Having resolved that the deductible provision must be given effect, we next consider the construction it must receive. INA contends that the deductible should apply to every step in Latham's trading spree that can be characterized as "dishonest" or "fraudulent." It submits that each trading loss should be offset by the deductible; if not, the deductible should apply to each of the two bad check episodes of December 12 and 13. In applying a single deductible to the total trading loss the lower court did not enter a *specific* finding to indicate why it did not apply the deductible more than once. Implicit in the findings that were made was the notion that all of Latham's trades and the two bad checks were parts of a single ongoing episode resulting in a single loss. To the extent that this is an implicit finding (and it is fully warranted by the evidence), INA has not demonstrated that it is clearly erroneous. *Cf. Merchant's Fire Assurance Corp. v. Lattimore*, 263 F.2d 232 (9th Cir. 1959). (Ninth Circuit applied clearly erroneous test to "implicit" finding.) [8] Because Latham's dishonesty is found in the totality of his ac-

---

4. If the coverage of the attached bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an Insurer other than the Underwriter and terminated, canceled or allowed to expire, the Underwriter, with respect to any loss or losses sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under the attached bond only for that part of such loss or losses covered by the attached bond as is in excess of the amount recoverable or recovered on account of such loss or losses under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

5. The attached bond shall be subject to all its agreements, limitations and conditions except as herein expressly modified.

8. It is quite understandable why the trial court entered no specific finding on this "multiple

deduction" issue. INA apparently chose not to raise it in the court below. At oral argument INA's counsel, having a definite impression that the issue had been fully developed in the district court, was nevertheless unable to direct this court to the portion of the record which would confirm his impression. We have since searched the record from one end to the other, and we cannot find any support for his impression either. The first reference we have been able to find to this "multiple deductible" issue appears in the *conclusion* portion of INA's initial brief to this court. Nonetheless, giving INA the benefit of the doubt as to whether it has preserved this issue for appellate review, the lack of a specific finding does not prevent us from resolving it because we are called upon to do no more than construe a document in the record. In so doing we are in no worse position than we would be had the trial court made a specific finding. *Armstrong v. Collier*, 536 F.2d 72 (5th Cir. 1976).

tions, the loss sustained by Howard was a single loss albeit the product of more than one act. We think our conclusion is mandated by the language of the deductible provision of the rider. Paragraph one thereof refers to a requirement that ". . . such loss or *losses* shall exceed *in the aggregate* the sum of Thirty five thousand Dollars ($35,000.00). . . ." (Emphasis supplied.) These words indicate that a chain of events constituting one episode was contemplated by the parties. This construction is consistent with Section 7 of the policy, referred to in paragraph one of the rider, which grants coverage for losses occasioned in any one of four ways:

. . . (a) any one act, not implicating an Employee, of robbery, burglary, hold-up or attempt thereat, or (b) any one act or omission of any person (whether or not an Employee) resulting in misplacement of, damage to, or destruction of, Property, or (c) acts or omissions, other than those as described above, in which any person (whether or not an Employee) is concerned or implicated, or (d) any other single casualty or event. . . .

Subsection (c) clearly treats multiple acts or omissions as capable of resulting in a *single* loss. Subsection (d) bolsters this construction by referring to "any *other* single casualty or event." Thus, "acts" or "omissions" may be deemed a single "casualty" or "event."

■ Any other construction of these two subsections would render the deductible provision ambiguous in any case where the loss results from fraud or dishonesty made up of more than one act. Were we to find

such an ambiguity in this case, however, INA could still not prevail, for under Louisiana law such an ambiguity must be resolved against it, as the insurer. *Kendrick v. Mason*, 234 La. 271, 99 So.2d 108, 114 (1958). This is particularly so where the construction urged by the insurer would operate to limit coverage. *Commercial Capital Systems, Inc. v. Paille*, 333 So.2d 293 (La.1st Cir. 1976).

## IV

Louisiana law provides that, if an insurer's failure to pay a claim within sixty days after receipt of satisfactory proof of loss is "arbitrary, capricious, or without probable cause," the insured may recover in addition to the amount of the loss a 12% penalty and attorneys' fees.[9] The lower court found that "INA's refusal to pay the claim was not, as a matter of fact, arbitrary and capricious." *Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Company of North America*, 397 F.Supp. 1279, 1283 (E.D.La. 1975).

■ Howard contends that under Louisiana law an insurer litigates coverage questions at its peril, and that even where an insurer *mistakenly* refuses to pay a claim within sixty days as required by section 22:658 it is subject to the provided penalties. (*See* note 9 *supra*.) The Louisiana decisions on this issue indicate that the question of arbitrariness is a factual one. *Broadway v. All-Star Insurance Corporation*, 285 So.2d 536, 540 (La.1973); *Creole Explorations, Inc. v. Underwriters at Lloyd's London, et al.*, 245 La. 927 161 So.2d

---

**9.** Section 22:658 states:

All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees.

768, 775 (1964). This question was decided by the trial court and Howard has not demonstrated, as it must, that the lower court finding is clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20–21, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).[10]

AFFIRMED.

10. Howard's final contention on appeal, that the lower court erred in awarding interest only from the date of judicial demand, is without merit. *See Delegos Bros. Grain Corp. v. Fireman's Fund Insurance Co.*, 498 F.2d 1238, 1239 (5th Cir. 1974).