**ORIENTAL FINANCIAL
GROUP, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY,
Defendant.**

**Civil No. 00–2035 (DRD).**

United States District Court,
D. Puerto Rico.

March 11, 2004.

Jose R. Gonzalez–Irizarry, McConnell Valdes, San Juan, PR, for Plaintiff.

Carlos M. Rivera–Vicente, Fernando J. Fornaris–Fernandez, Cancio, Nadal, Rivera & Diaz, San Juan, PR, for Defendant.

## OPINION & ORDER

DOMINGUEZ, District Judge.

Pending before the Court is the June 20, 2003 Motion for Summary Judgment (Docket No. 77) filed by the Defendant Federal Insurance Company (hereinafter FIC"). The Court has reviewed said motion as well as the Opposition to Defendant's Motion for Summary Judgment filed by Plaintiff Oriental Financial Group (hereinafter OFG) on July 30, 2003 and FIC's reply (Docket No. 91) filed on August 19, 2003. At the Pretrial Conference the Court granted Plaintiff until August 20, 2003 to file a surreply (Docket No. 87). On August 20, 2003 Plaintiff requested an extension to file a surreply by August 22, 2003 (Docket No. 95). Although Plaintiff's surreply was not timely filed (Docket No. 104) the Court admitted said motion as specifically uncontested by the Defendants (Docket No. 105). As such, the Court considered the matter submitted.

## I. SUMMARY JUDGMENT STANDARD

The standard for summary judgment has been revisited by the First Circuit Court of Appeals on several occasions. *Serapion v. Martinez,* 119 F.3d 982, 986 (1st Cir.1997), (*citing McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995))(collecting cases); *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir. 1995). A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact. *Perez v. Volvo Car Corporation,* 247 F.3d 303, 310 (1st Cir.2001); *Grant's Dairy – Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.,* 232 F.3d 8, 14 (1st Cir.2000); *Cortes–Irizarry v. Corporacion Insular,* 111 F.3d 184, 187 (1st Cir.1997). A fact is "material" if it potentially could affect the suit's outcome. *Id.* An issue concerning such a fact is "genuine" if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor. *Id.* At the summary judgment stage, the trial court examines the entire record "in the light most flattering to the nonmovant and indulges all reasonable inferences in that party's favor. Only if the record, viewed in the manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *See*

*Cadle Company v. Hayes,* 116 F.3d 957, 959–60(1st Cir.1997).

The summary judgment machinery operates in two phases. First, the movant must produce a preliminary showing that there is no genuine issue of material fact which requires resolution in the crucible of trial. Once this showing has been made, the burden shifts to the nonmovant to demonstrate, through specific facts, that a trial-worthy issue remains. *Id.*

It is well established that the burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Now, this burden has two(2) components: an initial burden of production, shifting to the nonmoving party if satisfied initially by the moving party; and an ultimate burden of persuasion on the challenged claim at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Brennan, J., dissenting)(footnotes and internal citations omitted). The court shall first examine whether the moving party has discharged its initial burden of production and then proceed to determine if said party met its burden of persuasion. *Id.*

Now, the burden of production, which is imposed by Rule 56, requires that the moving party make a *prima facie* showing that, as a matter of law, it is entitled to summary judgment. *Celotex,* 477 U.S. at 330, 106 S.Ct. 2548. The manner in which the showing is made depends upon which party will bear the burden of persuasion at trial.

So, if the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548.

In applying the standard, the court must construe the record and all reasonable inferences from it in favor of the nonmovant (the party opposing the summary judgment motion). *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000); *Cortes–Irizarry,* 111 F.3d at 187; *see also United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). An absence of evidence on a critical issue weighs against the party—be it the movant or the nonmovant—who would bear the burden of proof on that issue at trial. *Perez,* 247 F.3d at 310; *see also Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 35–36 (1st Cir.1998); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990). As to the instant case, Defendants must not only show that there is "no genuine issue of fact," but also that they are "entitled to judgment as a matter of law." *Vega–Rodriguez v. Puerto Rico Telephone Co.,* 110 F.3d 174, 178 (1st Cir.1997).

Fed.R.Civ.P. 56 does not ask which party's evidence is more plentiful, better credentialed, or stronger weighted, because at the summary judgment stage, the Court may not weigh the evidence. *Cortes–Irizarry,* 111 F.3d at 187; *see also Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668 (1st Cir.1994). Summary judgment "admits no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id., (citing Greenburg v. Puerto Rico Mari-*

*time Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)).

The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.* "The Court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is contradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* However, it is sanctionable to impose upon the Court "the daunting burden of seeking a needle in a haystack...." *See Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 33 (1st Cir.2001)("This case is a lesson in summary judgment practice"). Accordingly, the First Circuit Court of Appeals has "encouraged district courts to adopt 'anti-ferreting' rules, which warn parties opposing summary judgment that, to preclude judgment as a matter of law, they must identify factual issues buttressed by record citations. '[O]nce so warned,' [that Court has] added, 'a party's failure to comply would, where appropriate, be grounds for judgment against that party.'" *Id.* (*citing Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 927 (1st Cir.1983)). The Court is ever mindful of this standard when reviewing summary judgement motions, as is the case here.

## II.  LANGUAGE OF THE FIDELITY BOND

■ In general, a fidelity bond is a contract whereby, for consideration, an insurer agrees to indemnify the insured against a loss arising from the "want of honesty, integrity, or fidelity of an employee or other person holding a position of trust." *Federal Deposit Insurance Corporation v. CNA Casualty of Puerto Rico*, 786 F.Supp. 1082, 1087 (D.Puerto Rico1991). As such, fidelity bonds are interpreted as insurance contracts and subject to the applicable rules of construction utilized for insurance policies generally. *Id.*, (*citing American Surety Co. v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898)).

The particular fidelity bonds in question provide, pursuant to their respective Rider No. 2, that the insured shall be indemnified by the insurer for:

(A) loss resulting solely or directly from one or more dishonest or fraudulent acts by an Employee, whether committed alone or in collusion with others, which acts are committed with intent:

(1) to cause the Insured to sustain such loss, or

(2) to obtain financial benefit for the Employee

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other similar benefits shall not constitute improper personal benefit.

*See Defendant's Motion for Summary Judgment*, Exhibit 1 (Docket No. 77); *Plaintiff's Opposition to Motion for Summary Judgment*, p. 6.

■ The Court must therefore examine the uncontested factual scenario to determine whether 1) a "loss" resulted; 2) dishonest or fraudulent acts were committed by an employee; and 3) the acts were committed intentionally to obtain a benefit or to cause OFG a loss. As other courts have noted, dishonest or fraudulent acts must be made willfully or intentionally and mere negligence, mistake, or error is insuf-

ficient to establish policy coverage. *See CNA Casualty,* 786 F.Supp. at 1087 (*citing Irvin Jacobs & Co. v. Fidelity & Deposit Co.,* 202 F.2d 794 (7th Cir.1953)); *First Nat'l Bank of Sikeston v. Transamerica Ins. Co.,* 514 F.2d 981, 987 (8th Cir.1975). The Court begins by analyzing whether the requisite intent and dishonest or fraudulent acts have been substantiated.

## III. INTENT, FRAUD, AND DISHONESTY

As noted above, Plaintiff must establish that the employee's actions were fraudulent or dishonest and intended to cause OFG a loss or to obtain a financial benefit to the employee. Both determinations require the Court to make a subjective evaluation of an individual's motivation.

As is normally the case, the Court is reluctant to make a ruling at summary judgment establishing that no intent existed or that fraud and dishonesty was lacking from certain acts. This is precisely because issues of motive and intent as to the conduct of any party normally foreclose summary judgment. *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 677 (1st Cir.1996)(reversing summary judgment and noting that "determinations of motive and intent . . . are questions better suited for the jury")(internal quotation marks and citation omitted); *see also Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. 1551, 1555 (S.D.Fla.1990)("Certain issues such as fraud, intent and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontroverted proof of a 'smoking gun' "). Further, findings as to the design, motive and intent with which men act are factual issues for the trier of fact. *U.S. v. Yellow Cab. Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

As stated in *Poller v. C.B.S.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962):

> Summary procedures should be used sparingly in . . . [cases] where motive and intent play leading roles . . . It is only when the witnesses are present and subject to cross examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice".

The Supreme Court has been equally clear regarding the court's role in weighing evidence and assessing the witness' credibility during summary judgment and has therefore ruled that: "[I]t is clear enough from our recent cases that at the summary judgment stage the [trial] judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Further, the First Circuit has utilized and built on the theme of banning at summary judgment stage the making of credibility determinations:

> [T]he nonmoving party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him . . ." The precincts patrolled by Rule 56 *admit of no room for credibility determinations, no room for the measured weighing of conflicting evidence* such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record. *Greenburg v. Puerto Rico Maritime Shipping,* 835 F.2d 932, 936

(1st Cir.1987) (emphasis added) (*citing Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

Finally, the First Circuit has reiterated that at Rule 56 stage, the Court shall examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant rather than consider credibility issues, resolve conflicts of testimony or evaluate the weight of evidence. *Wagenmann v. Adams,* 829 F.2d 196, 200 (1st.Cir.1987).

Defendant argues that under Claim 3–A (for $3,442,000) neither employee Flores or Ayala intended a loss to the bank. To substantiate this argument, Defendant points to Ayala's deposition wherein he states that he intended no loss to OFG. Under Claim 1–B (for $5,605,396.24), Defendant utilizes Ayala's deposition statements in addition to similar statements made by employee Gonzalez to the effect that no loss was intended. These deposition statements are insufficient to establish, as an uncontested fact, that no intent existed. The employee's intent to cause a loss to OFG may be substantiated via circumstantial evidence and "a claim by an employee that he intended no loss to the bank is not conclusive." *Federal Deposit Ins. Corp. v. United Pacific Ins. Co.,* 20 F.3d 1070, 1078 (10th Cir.1994).

■ Flores, Ayala, and Gonzalez all represented that they understood the repercussions of their actions. In addition to the actual acts taken by the employees, this understanding of the employees is sufficient to establish circumstantial evidence of the required intent. As a result, the Court must withhold a determination as to whether the required intent has been established. Such a question of motive and intent is not properly determined by the Court at summary judgment.

In relation to the employee's actions being fraudulent or dishonest, the Court is also constrained by the fact that such a determination would require the Court to impinge on the province of the jury by evaluating evidence substantiating this question of fact. As the Supreme Court of Puerto Rico stated, "in order that the act may be characterized as dishonest, it need not involve conduct punishable under the penal statutes; it need not partake of a criminal nature ... [C]onduct may be dishonest even though the doer of the act does not personally profit by his action; and the determination of whether conduct is dishonest is a question of fact." *Raval, Inc. v. Maryland Casualty Co,* 1964 WL 14374, 89 D.R.R. 854, 858–89 (1964). The Court agrees with Defendant that very little evidence has been provided which would tend to establish that the employees acted fraudulently or with dishonesty; however, the Court believes that the acts actually taken by the employees, improper and deliberate reconciliations and deletions, are sufficient to circumstantially establish the fraudulent or dishonest acts required by the policy. This being the case, the Court turns to the pivotal issue in this case, whether OFG suffered a loss under the fidelity bond.

## IV. LOSS

For coverage under the fidelity bonds, OFG must have suffered a loss resulting solely or directly from one or more dishonest or fraudulent acts by an Employee whom must **act with the intent** to cause the injury to the insured. The actual term "loss" is not defined by the contract language nor have the local courts of Puerto Rico provided any guidance as to the parameters in which this Court should utilize in applying the term.

■ Plaintiff attempts to aid the Court by pointing to caselaw in which courts have utilized records to quantify the in-

sured loss. The Court agrees with Plaintiff that a loss may be quantified via inventory or accounting records. *See Consolidated Express v. Maryland Casualty Co.*, 102 P.R. Dec. 480 (1974); *Banco De San German v. Maryland Casualty Co.*, 344 F.Supp. 496 (D.Puerto Rico 1972). However, the ability to quantify a loss is quite different from delineating the bounds of the term "loss" under the fidelity bond.

In fact, several courts have held that the phrase "losses directly resulting from ..." in a fidelity bond indicates a **"direct loss or actual depletion of bank funds** caused by the employee's dishonest acts." *United Pacific*, 20 F.3d at 1080 *(emphasis added )(citing First American State Bank v. Continental Ins. Co.*, 897 F.2d 319, 325 (8th Cir.1990)); *American Trust & Sav. Bank v. United States Fidelity & Guaranty Co.*, 418 N.W.2d 853, 855 (Iowa 1988). Furthermore, **"[b]ookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss is not recoverable."** *United Pacific*, 20 F.3d at 1080 *(emphasis added )*; *see also Everhart v. Drake Management, Inc.*, 627 F.2d 686, 691 (5th Cir.1980); *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 463 F.2d 4, 6–7 (5th Cir.1972).

Rather than directly dispute the fact that bookkeeping and theoretical losses are not recoverable, Plaintiff utilizes cases where actual pecuniary losses were sustained and accounting records were utilized to establish the *extent* of losses. In essence, Plaintiff is handing the Court a tool to measure the quantity of losses and because the requirement of intent may be met by showing that the losses incurred were a natural and probable result of the fraudulent acts committed by the ex-employees then the plaintiff invites the Court to conclude that a loss existed.

Unlike *Consolidated Express* and *Banco De San German,* the case at hand does not involve inventory missing from storage or money missing from a bank's vault. Because classic "losses" were alleged, the inventory and accounting records were extremely useful in determining the *amount* of inventory and the *amount* of money stolen since the insured could not compute the total property actually taken. Assuming that the accounting records were accurate, the underlying fact that property was actually taken from the insured could not be contested. In this way, both *Consolidated Express* and *Banco De San German* represent the classic model for a claim under a fidelity bond wherein an employee, through fraud or dishonesty, takes property owned by the insured, inventory and money respectively.

The same cannot be said for OFG, nor does OFG even allege that actual money has been taken or a pecuniary loss has been actually suffered as a result of the employees' actions.[1] Instead, OFG alleges that certain key employees engaged in conduct which caused OFG to lose track of transactions and eventually caused OFG to write-off millions in order to balance their accounting records. OFG makes no claim that any employee absconded with OFG funds. The proof of loss claims are limited to acts of incorrectly making accounting changes which resulted in account discrepancies which caused a series of large write offs. At this last stage there is a pecuniary loss.

FIC proposes the Court that in order to determine if there is coverage for the loss-

---

1. At the Pretrial Conference the Court stressed a concern that Plaintiff should emphasize on establishing the "loss".

es, the Court shall first examine if there is a real or pecuniary loss, which is a question of law and not a matter of fact, and then proceed to determine if the employee had any compensation not received in the ordinary course of business and to evaluate if there was an intent to cause the injury to the insured. The Court cannot avail FIC's proposal for the simple reason that it is equivalent to award a loss without analyzing the essential elements for recovery pursuant Rider No.2. To this extent, even in the light most favorable to Plaintiff, whether OFG's claim of loss is a pure bookkeeping or theoretical loss not covered under the fidelity bonds, is an issue to be determined by the trial of fact after its determination of intent to cause harm and the former employees' personal benefit. After all, it is a sensible-sounding principle that "one is presumed to intend the natural and probable consequences of one's actions." *See, e.g. United States v. Cooper*, 577 F.2d 1079, 1082–83 (6th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

It is known that a trier of fact can make inferences regarding intent based on the **natural and probable consequences of actions.** It could hardly be otherwise. *Federal Deposit Insurance Corporation v. St. Paul Fire and Marine Insurance*, 942 F.2d 1032, 1035 (1991). As used in the ordinary language, intent is thought to refer to a subjective phenomenon that takes place inside people's minds. *Id.* Therefore, since the determination of intent is an issue to be addressed by the jury, the Court is precluded from granting the summary judgment requested. *Yellow Cab. Co.*, 338 U.S. at 341, 70 S.Ct. 177.

The Court examines now in seriatim fashion each proof of loss claim.

## V. PROOF OF LOSS 1–A ($353,219)

Proof of Loss Claim 1–A arose from activities allegedly uncovered by OFG on August 14, 1998. Miguel Flores, an employee of OFG, was investigated for his participation in an embezzlement scheme. OFG ultimately discovered that Mr. Flores had diverted $377,696.65 to separate accounts and made several withdrawals of OFG funds. Mr. Flores was in a position of trust and manipulated and altered the Accounts Receivable/Returned Check (AR/RC) Subsidiary Ledger and credited checking accounts of closely related parties. He was then able to make illegal withdrawals. Mr. Flores repaid a substantial portion of the embezzled amount and executed promissory notes for the remainder. OFG's Proof of Loss 1–A does not include any claim for money actually embezzled by Mr. Flores.

After OFG uncovered Mr. Flores' embezzlement, an investigation began to examine the AR/RC account. This investigation uncovered that the subsidiary ledger of returned checks was not accurately maintained by Mr. Flores. Price Waterhouse Coopers (PWC) determined after performing an audit, that the account had assets in the amount of $353,219 (the Proof of Loss amount) which were not supported by actual checks.

OFG claims that $239,421 of this amount was kept in the subsidiary account so that Mr. Flores could inflate the general ledger account and still keep the two accounts closely reconciled. OFG claims that $166,750 represents the amount of unidentified credits in the subsidiary account not equated to entries in the general ledger.[2] If these checks existed, they should have been in OFG's possession, as they had yet

---

2. Proof of Loss 1–A was later amended to recognize a $17,977 and $34,975 adjusted reduction.

to be removed from the general ledger. OFG has been unable to locate them. OFG posits that these unidentified funds, which represent a potential claim OFG has against the subscribing customer, are lost assets causing OFG a loss.

Plaintiff explains that the $239,421 represented returned checks "removed from the AR/RC general ledger control account and were not part of the ledger balance, but were intentionally and fraudulently kept by Flores in the subsidiary ledger." (Plaintiff's Opposition p. 21). In order for the returned checks to be eliminated from the general ledger they had to be first processed by the appropriate department wherein the customer's payment which was previously applied would be reversed and collection efforts could begin. After the department made this reversal, the general ledger could be subtracted by the check amount as the check was no longer "receivable" since the appropriate department had reversed the customer's payment.

Flores' scheme was designed not to remove the checks from the subsidiary ledger after proper notice from proper collection department at OFG which in turn resulted in not removing the now collected checks from the subsidiary ledger. Since the checks were not removed from the subsidiary ledger, Flores inflated via an accounting entry in the AR/RC general ledger which allowed him to credit deposit accounts of related parties and to later withdraw cash from said deposit accounts.

This system did not represent the true balances in the AR/RC general ledger nor the AR/RC subsidiary ledger. Since the AR/RC is an asset account used by the bank to temporarily record and keep track of uncollected returned checks, these returned checks are OFG's assets therefore, OFG has a claim against the customers who wrote them to pay debts with OFG.

These claims are accountable pursuant to *Consolidated Express* and *Banco De San German.*

Further, Proof of Loss 1–A describes the remaining $166,750 as checks which appear in the general ledger and were outstanding for a "long period of time". Apparently, these items listed in the general ledger are physically missing. The general ledger does not contain any identifiable corresponding credit which would allow OFG to "match" the money. Furthermore, "[t]he authenticity of this balance of checks that could not be traced, is highly questionable, as the general ledger balance is most probably comprised of fictitious items. Further work to trace each of these items would not be possible" due to the amount of credits. *See* Proof of Loss 1–A p. 10. Since the checks are missing, and this AR/RC account is an asset, the bank cannot collect said assets, therefore a loss is recognized.

Flores' transactions at the very least are evidence of a scheme in which bank's accounts manipulation, intent to deceit and fraud may be present and at as such, the Court is precluded from entering summary judgment because the determination is imbued with issues of motive and intent. *St. Paul Fire and Marine Insurance,* 942 F.2d at 1035; *Tew,* 728 F.Supp. at 1555.

## VI. PROOF OF LOSS 3–A ($3,442,450)

Proof of Loss 3–A relates to OFG's cash accounts with the Federal Loan Home Bank (FLHB) and Citibank. OFG argues that Mr. Flores, Carlos Ayala, and Juan Carlos Gonzalez manipulated the reconciliations of these cash accounts and concealed the true cash account balances, resulting in an alleged loss to OFG in the amount of $3,442,450.00.

In March 1997, OFG's external auditors, PWC, requested that the cash accounts be reconciled. Mr. Flores was instructed to

assist in resolving the reconciling items. OFG proffers facts that Mr. Flores indiscriminately eliminated transactions by arbitrarily matching credits and debits without verifying their relation. This resulted in an altered reconciliation being provided to PWC in April 1997. Afterwards, $2.5 million of the cash balance was unaccounted. Then, in October 1997 Ayala allegedly instructed an employee to again eliminate transactions in the FLHB account so that a reconciled accounting statement could be provided to the Federal Deposit Insurance Company (FDIC). In November 1998, Ayala and Gonzalez, employees in a position of trust, were confronted about improper reconciliations; they were eventually terminated in employment.

An investigation by PWC determined that the manipulation of the accounts caused an alleged loss of $3,442,450 to OFG. The end result was that unresolved transactions representing deposits and payments in OFG's books or on FHLB and Citibank statements of activity simply could not be identified or traced to any supporting records. As a result, examining the evidence in the light most favorable to plaintiff as the Court must at summary judgment, OFG allegedly lost control and track of the deposits and payments. (See Proof of Loss 3–A).

OFG and FIC do not contest that OFG's former employees had some scheme which resulted in the alteration and manipulation of the cash accounts reconciliations for Citibank and the Federal Home Loan Bank (FHLB) accounts. FIC asserts that this amount relates to an "accounting imbalance" product of OFG's deficient enforcement of its' reconciliations policy. In support of their position, FIC affirms that OFG has had this problem since 1993. (Defendant's Motion for Summary Judgment, p. 13–15).

FIC basically affirms that the claim was properly denied because there was no loss, there was no evidence of employee dishonesty or fraud and there was no evidence of an intent to cause a loss to the insured or the intent to obtain a personal benefit. First, FIC asserts that OFG did not present evidence as to the funds being disbursed to any of the alleged participants, that no evidence was submitted to support the allegation of any dishonest or fraudulent acts neither and finally, that there is no evidence on the record that can be used to prove that the former employees acts were intended to cause a loss to OFG or to obtain a personal benefit.

OFG counters by stating that these manipulations resulted in "unresolved transactions that represent deposits and payments recorded in OFG's books which can not be identified or traced to any supporting records ... therefore causing Oriental to loose control of their assets, and preventing Oriental from realizing said assets". (Plaintiff's Opposition, P. 26).

At this point, the Court must examine the parties' allegations under the standard to grant a petition for summary judgment. First, the Court shall determine if the movant has made a *prima facie* showing that, as a matter of law, it is entitled to the summary judgment requested. *Celotex*, at 330, 106 S.Ct. 2548. In other words, we shall determine if FIC met its' burden of production. Having examined FIC's motion for summary judgment and its' reply to the Plaintiff's opposition the Court opines that FIC has not met the burden of proof required by the Rule and its related caselaw.

FIC's motion for summary judgment lacks proof sufficient to establish a *prima facie* showing that it deserves the remedy requested. First, there is no affirmative evidence on the record that negates any of the essential elements of OFG's claims.

Neither has FIC competently demonstrated that the evidence submitted by OFG is insufficient to establish the essential elements of its claim. *Celotex*, at 331, 106 S.Ct. 2548. In other words, FIC has failed to provide evidence showing that the losses claimed by OFG are not real losses covered by the fidelity bond. Further, FIC has failed to provide evidence demonstrative that the losses claimed by OFG are either "bookkeeping or theoretical losses" for which there is no bond coverage. Basically FIC's motion is a summary of the facts to the case and an array of inferences which if construed as requested would be equivalent to grant a remedy based on their suggestions on how the law should be applied to these facts. FIC may be correct, but the task of weighing evidence does not belong to the Court but to the interpreters of the facts. Further, inferences at summary judgment must be made in favor of the non-movant. Last, FIC's motion rests on the argument that OFG's claims is not supported by evidence as to the losses, the intent and the dishonest or fraudulent acts performed by the former employees.

The Court is unpersuaded by FIC's proposal. The Court cannot judge as to which evidence is more plentiful, its more believable or better credentialed or has a stronger weight. *Cortes–Irizarry*, 111 F.3d at 187. Issues raised by FIC as to the intent and dishonesty of the former employees precludes the entry of the summary judgment requested. Further, it's our duty in applying the standard of review, to construe the record as a whole and make all reasonable inferences in favor of the non-moving party. *Suarez*, 229 F.3d at 53. At this brevis disposition stage of the proceedings, the Court is precluded from granting Defendant's motion.

Even if FIC has met the threshold imposed by the Rules and by *Celotex* as to the burden of production, OFG has countered by providing different expert witness' reports concluding that OFG incurred in a loss. Therefore, the Court cannot grant the summary judgment requested pursuant to the doctrine set forth in *F.D.I.C. v. CNA Casualty of P.R.*, *Id.*, since there exists genuine issues of material fact precluding summary judgment, conduct that may be construed as dishonest covered under the fidelity Bond.

## VII.  PROOF OF LOSS
### 1–B ($5,605,397)

Proof of Loss 1–B is related to the manipulation of the Mortgage Loans Accounts reconciled by Mr. Gonzalez and Mr. Ayala. In December 1998 Mr. Gonzalez and Mr. Ayala were assigned as part of a task force created by OFG to analyze and reconcile the accounts related to OFG's mortgage loans portfolio. Mr. Gonzalez and Mr. Ayala initially represented that only a minor unreconciled difference of $64,000 existed in these accounts; however an October 1999 OFG detailed analysis of the mortgage loan portfolio uncovered an unusual transaction dated December 7, 1998 in the amount of $3,865,921.88 made by Mr. Ayala, which eventually uncovered another similar unusual transactions dating back to August 1997. See Proof of Loss 1–B, p. 5.

In August 1997, Mr. Gonzalez made a credit and debit of $725,585 in an apparent attempt to conceal the shortfall of the Mortgage Loans Conventional account's balance. The credit, from the payment in process general ledger account, would be added, and then the necessary report could be run showing no shortfall. The next day the credit would be reversed and the previous shortfall would once again exist on the books. The true balance of the account was therefore concealed.

In November and December of 1997 a similar set of credits and debits were made

to the mortgage accounts. This time the shortfall was $3,359,895 and was again concealed for reporting purposes.

By June 1998 the credit/debit amount required to cover the shortfall was $3,865,921.88. This amount was credited and debited from the mortgage account in June, October and December of 1998. Additional manipulations of the Managers Checks Account were required to conceal the credit and debits related to the mortgage account shortfalls. Then OFG reconstructed the mortgage loans portfolio accounts and discovered that the reconciliation had an additional $1.7 million of unsupported assets. This allegedly gave OFG a total loss of $5,605,397. See Proof of Loss 1–B.

The Court is again faced with the application of similar facts. Basically, FIC's arguments are repetitive as to the lack of evidence showing that OFG incurred in a loss. This time FIC asserts that there is no loss since OFG's Proof Of Loss 1–B shows that entries made and then reversed is a shifting of money within the bank which may be found in either account. FIC sustains that this shifting of balances from one account to another is precisely the type of "loss" not covered by the fidelity bond pursuant to *Calistoga Bank v. Fidelity & DepositCo. of Maryland*, 5 Cal. App.2d 248, 42 P.2d 1051 (1935).

Further, as to evidence showing intent to deceive carried on by the former employees, FIC claims that the Proof Of Loss 1–B "is completely devoid" of this evidence and that the entries related to this claim had to be performed by an employee other than Ayala or Gonzalez who had access to the computer system since the entries were initialized "BOD". FIC asserts that it was commonly known that these "BOD" entries were made by Bernardo Negron, the employee responsible for month-end closing entries in preparation for the Board of Directors reports and he has not been accused of any wrongdoing. FIC further rests on a statement made by the bank's general auditor as to the effect that he could not say if there was a fraud related to the entries herein described. Last, as to the former employees' intent to cause a loss to OFG, FIC states that their unsworn declaration under the penalty of perjury declared that there was no intent to cause a loss or to obtain a financial benefit for themselves.

Accordingly, OFG counters by claiming that Ayala made the December 1998 fraudulent entry. (Plaintiff's Opposition, P.29). Further, Ayala and Gonzalez used a different account to disguise their entries with the intent to conceal from management the different entries made and misrepresent the asset accounts reconciliations. (Plaintiff's Opposition, P.31–32). OFG sustains that the several entries made by Ayala and Gonzalez are sufficient evidence that the former employees prepared/or knew about the fraudulent entries made to conceal a shortfall in the mortgage account and consequently forcefully reconciling the mortgage loans portfolio accounts. Finally, OFG claims that Gonzalez being the Assistant Comptroller should have known that the entries made would lead to the recognition of a loss by OFG.

Once again, FIC's argument is elaborated with the intent to move this Court to weigh the evidence submitted by OFG. *Wagenmann v. Adams*, 829 F.2d. at 200. As this Court stated before, FIC's claim that there was no actual or real loss and mere a theoretical or bookkeeping loss is not supported by evidence on the record. Further, as to the issues of intent raised by FIC regarding former employees behavior not intended to cause a loss to OFG, it is well known that self serving expressions are not sufficient to establish the lack of intent. *Federal Deposit Ins. Corp.*, 20

F.3d at 1078 (*citing First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162, 1166 (5th Cir.1992)). Hence, the Court cannot grant the summary judgment requested.

## VIII. EXPENSES CLAIMS

FIC asserts that the claim for expenses submitted by OFG under Rider No. 34 of the fidelity bond should not be granted since there is no loss covered by the bond.[3] OFG responds by stating that since reasonable evidence has been provided in support of their claim that a loss covered by the bond was incurred, expenses shall also be consequently awarded under the bond. The Court deliberately withholds any ruling regarding coverage for expenses since said determination will be awarded only if the trier of fact determines that the losses were covered by the fidelity bond. At this stage of the proceedings said determination is premature.

## IX. SINGLE CLAIM ISSUE

OFG has filed three (3) Proof of Loss (POL 1–A, POL3–A and POL–1B)in which coverage for losses in excess of NINE MILLION DOLLARS ($9,000,000.00) are claimed. Each bond has a ceiling of 7.5 Million Dollars. Miguel Flores is the only employee implicated in the loss claimed in POL 1–A. Likewise, the alleged acts incurred by Flores and Carlos Ayala and Carlos Gonzalez gave rise to the loss claimed in POL 3–A. Finally, Ayala and Gonzalez through their acts, are solely responsible for the loss sustained and claimed in POL 3–B. It is noted that POL 1–A and POL 3–A are filed under Bond No. 81522315–A which coverage term was from June 30, 1998 to June 30, 1999. Likewise, POL 1–B is claimed under Bond No. 8152231–B which covered the period beginning on June 30, 1999 to September 28, 2000.

FIC proposes that since Flores was involved in the losses claimed in POL 1–A and POL 3–A both proof of losses are, within the meaning of the bond, a single loss within Bond 81522315–A. Likewise, being Ayala the common denominator in claims submitted in POL 3–A and POL 1–B under Bond 81522315–B therefore the claims under both bonds constitutes a single loss for purposes of coverage.

OFG states that the three different proof of losses submitted do not constitute a single claim because according to the definition provided in the bond, no single employee is implicated in all three claims. First, claim 1–A and 1–B cannot be considered a single claim since the employees involved in both claims are not the same. Hence, claim 1–A and claim 3–A could be considered a single claim for purposes of Bond No. 81522315–A. However, since each of the bonds applies to the "loss discovered by the Insured during the bond period," OFG claims FIC's liability is predicated on the discovery date of each claim. Therefore since claims 1–A and 3–A occurred and were discovered while Bond A was in effect these claims should be treated as a single loss under Bond A. Likewise, OFG claims that since Flores was not involved in claim 1–B and this claim was discovered while Bond B was in effect, such claim must be considered a separate loss under this bond.

In order for the Court to decide whether all claims are considered a single claim resulting in a bind ceiling, the Court must first examine the language of the bond. Section 3 DISCOVERY is clear on limiting

---

**3.** Rider No. 34 provides for $100,000.00 in coverage for: "[R]easonable expenses incurred and paid by the insured, solely for independent firms or individuals retained to determine the amount of loss where ... the loss is covered under the bond, and the loss is in excess of the applicable Deductible Amount".

bond coverage to losses discovered by the insured during the bond period. (Motion for Summary Judgment, Exhibit F, page 15). In order to consider different actions as a single loss claim for fidelity bond coverage, the Court must examine if they "arouse out of the same pattern of conduct or scheme that was originally discovered". *F.D.I.C. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969, 974 (1st Cir.1995)(quoting *Howard, Weil, Labouisse, Friedrichs v.Ins. Co. of N. Am.,* 557 F.2d 1055, 1059–60 (5th Cir.1977))(dishonesty found in "totality of actions," loss sustained was a "single loss albeit the product of more than one act" through part of "a single ongoing episode").

■ FIC has failed to show that the totality of the actions performed by the former employees should be considered an ongoing episode. The proffered facts do not demonstrate that one of the former employees was involved in all three transactions and hence the different acts by them performed could be hardly considered a "single ongoing episode". Therefore, the Court sustains that Bond A shall provide coverage for claim 1–A and 3–A and Bond B to the claim 1–B.

The Court is of the opinion that examining the facts in the light most favorable to the party opposing summary judgment, claim 1–A and 3–A are covered by Bond A and likewise, Bond B will provide coverage for claim 1–B. By no means, this should be interpreted as the Court holding that Claim 1–A and 3–A are a single claim for purposes of coverage under Bond A. Further, the Court stresses that for a bond to provide coverage for all three (3) claims, the intent to commit entirely new different acts of dishonesty rather than to continue the initial act, "intent" and/or "motive" must be determined by the Court. *Business Interiors, Inc. v. Aetna Casualty and Surety Company,* 751 F.2d 361, 363 (10th Cir.1984). Once more, intent has to be determined by the Court. Intent is a conclusion to be determined by the jury and not a matter to be dismissed via summary judgment by the Court.

Finally, the jury could very well grant or deny any one of the three (3) claims or two(2) of the three (3) claims making this entire matter totally premature.

## X. DOLO CLAIM

FIC proposes that OFG's asserted in its' claim that their handling of the case was done "in bad faith, or *dolo* as the concept is defined in the Puerto Rico Civil Code and as such should be dismissed". FIC requests the claim's dismissal stating that there is not sufficient evidence on the record which demonstrate that FIC's refusal to provide coverage, was in itself an act of "bad faith". After quoting pertinent case law as to the definition of *dolo* and whether a tort action will lie for an insurer's wrongful refusal to pay an insurance claim, the standard provided for *dolo* is "either conscious wrongdoing, reckless indifference or the lack of a reasonable basis for denying the claim". The matter is fraught with issues of motive and intent.

■ As stated hereinbefore, unsettled issues of motive and intent as to the conduct of any party will normally preclude the Court from granting summary judgment. *Mulero–Rodriguez,* 98 F.3d at 677 (reversing summary judgment and emphasizing that "determinations of motive and intent ... are questions better suited for the jury") (internal quotation marks omitted) (citation omitted); *see also Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. at 1555 ("Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence ex-

cept in the rare case where there is uncontroverted proof of a 'smoking gun.' "). However, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences [or] unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). But the instant case has more on that mere "conclusory allegations" and/or "unsupported speculation".

Therefore the Court at this time is precluded from dismissing the "Dolo" claim as stated by FIC since issues of motive and intent should not be addressed via summary judgment and are better suited for the jury to award.

## XI. CONCLUSION

The Court recognizing that issues of motive, intent and the weighing of evidence are properly left for trial, withholds the granting of summary judgment requested by FIC. Rulings regarding the requirement that a fraudulent or dishonest act be intentionally aimed at financial gain or a loss to OFG are rulings that are imbued with intent and shall therefore be addressed by jury. Further, the Court is reluctant to dismiss a claim in the presence of abundant circumstantial and/or direct evidence that a jury may interpret that a loss occurred as a result of the acts perpetrated by the former employees. *Cf. Den Norske Bank AS v. The First National Bank of Boston*, 75 F.3d 49, 58 (1st Cir.1996).

Defendant's *Motion for Summary Judgment* (Docket No. 77) is **DENIED.**

**IT IS SO ORDERED.**